Nathan Carl **SCHWARTZ**

v.

**UNITED STATES of America.**

Civ. A. No. 23802.

United States District Court

E. D. Pennsylvania.

June 17, 1964.

Alfred S. Julien, of Julien & Glaser, New York City, Jerome Hoffman, Philadelphia, Pa., for plaintiff.

Hubert Crean, Vincent H. Cohen, Dept. of Justice, Washington, D. C., for defendant.

FREEDMAN, District Judge.

This tragic case is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674. While serving in the Navy in England during World War II plaintiff had attacks of breathing difficulty. When his battalion returned to the United States in 1944 he was treated for sinusitis in the Naval Hospital at St. Albans, New York. For X-ray purposes a radioactive contrast dye, umbrathor,[1] was inserted into his sinus. The X-ray revealed the presence of a rounded shadow believed to be a polyp in the floor of the left antrum. (P.'s Exh. 2; Transcript, p. 43).

Plaintiff received a medical discharge from the United States Navy on January 27, 1945. In April of that year he applied to the Veterans Administration clinic, then located in the Philadelphia Naval Hospital, for treatment of his sinus trouble. His medical report and history were received from the Naval Hospital at St. Albans by the Veterans Administration in the Philadelphia Naval Hospital in 1945 and kept in a claims folder relating to the plaintiff. (Transcript, pp. 90–91, 690). In these St. Albans records the word "umbrathor" was underscored and repeated in large capital letters. (P.'s Exh. 3). X-rays taken at the Veterans

---

1. Umbrathor is a trade name for a non-stabilized colloidal solution of thorium dioxide. The stabilized solution of thorium dioxide is known as thorotrast. (See P.'s Exh. 38).

Administration clinic in 1945 without the insertion of any contrast material showed the presence in the left antrum of an opaque substance which was assumed to be lipiodol, a non-radioactive iodized oil which was commonly used in X-ray studies. (P.'s Exh. 1; Transcript, pp. 41–42).

Plaintiff again visited the Veterans Administration clinic for treatment in 1947. The clinic physician sent him to the Jewish Hospital for X-rays; the X-ray report from the Jewish Hospital noted the presence of retained iodized oil in the left maxillary sinus. (P.'s Exh. 5). In October of 1948 plaintiff returned to the Veterans Administration clinic for treatment and was placed under the care of Dr. Harry Schluederberg, Chief of the Ear, Nose and Throat Department. X-rays taken at the clinic in November and December of 1948 revealed the presence of "a large amount of opaque material from a previous diagnostic study in the left maxillary sinus." (P.'s Exh. 6*l*). Plaintiff was not told or asked about this substance, but the doctor suggested an antrum wash, an office procedure for irrigation of the sinus. This the plaintiff declined because he was awaiting Veterans Administration approval of his request for permission to have his own physician treat him. (P.'s Exh. 6a, b; Transcript, pp. 902–03). Dr. Schluederberg's diagnosis was suspected allergic rhinitis. He saw no sign of active sinus disease. (P.'s Exh. 6j). No further suggestion of an antrum wash was made and no steps were taken to discover what the substance was or to remove it from the sinus. No effort was made to obtain plaintiff's prior medical records. (Transcript, pp. 262–63).

In February 1953 plaintiff returned to the clinic complaining now of burning in the nose and throat, headaches and discharges of blood and pus. Dr. Schluederberg saw him several times in February and March 1953 and administered local nasal treatment. He noted on the treatment record that the "left max[illary] does not transmit light well", indicating that some opacity obstructed the passage of light. (P.'s Exh. 7a). In March the doctor noted that he found no symptoms. He consulted the 1948 X-ray study, but made no effort to obtain plaintiff's prior medical records.

Plaintiff next saw Dr. Schluederberg at the clinic on April 26, 1955. He complained of fullness of the throat and spitting blood, but examination was negative and no treatment was given. Plaintiff returned in March 1956 complaining of burning, clogging and pain in the nose and throat, discharges, a general feeling of weakness and a sick headache. Dr. Schluederberg noted: "Left antrum, as usual, does not transmit light." (P.'s Exh. 8a). Coricidin was prescribed. Dr. Schluederberg saw the plaintiff 36 times during 1956. In later visits during 1956, crust was removed from the posterior pharyngeal wall. In August plaintiff complained of spitting blood and a chest X-ray was ordered, which proved negative. In general plaintiff's complaints of sinusitis symptoms were not borne out by the doctor's findings.

Finally, a routine tooth extraction in October 1956 led to the discovery of plaintiff's true condition. For several weeks after the extraction, a dark solid material flowed from the socket. X-rays were taken on November 16th and the record notation for November 26th shows: "Left maxillary does not transmit light. X-ray studies indicate active disease." Penicillin was administered. (P.'s Exh. 8d). On December 6th the doctor found that the left maxillary now transmitted light "rather well". (P.'s Exh. 8e). On December 12th the doctor found that a bloody secretion was flowing from the fistula, so he ordered it closed in the dental clinic on the following day. At this time, a radiopaque material was instrumentally removed by the surgeon from the fistulous tract and sinus.

Early in 1957 a biopsy diagnosis indicated a condition of squamous cell carcinoma of the left maxillary sinus. Plaintiff was hospitalized, another tooth was removed, and a biopsy of material on the tooth root confirmed the existence of

à carcinoma. Dr. Schleuderberg later concluded (in a memorandum dated June 3, 1957) that in a slow continuous process small polyps in the left maxillary sinus had been "constantly irritated by a radio-active foreign substance eventually resulting in a malignant tumor." (P.'s Exh. 11; Transcript, p. 416). Radical surgery was performed at Memorial Center in New York City on February 8, 1957. Plaintiff's left eye was removed and much of the bony structure, nerve systems, muscles, and tissues of the left side of his face were excised, including the cheek bone, the left palate and upper teeth, the maxillary sinus, the ethmoid and sphenoid sinuses, the nasal turbinates, and part of the jaw bone. A skin graft was made from his abdomen and inserted in the orbital cavity.

Plaintiff suffered great anxiety, pain and discomfort in the period before and after the operation. The knowledge that he had cancer came as a complete and shocking surprise. He was given reason to fear that agony and death from cancer of the throat awaited him. After the surgery, he lay in the hospital with a suction machine for removal of phlegm, a tube through his nose for feeding, and horrible pain. For a while his speech was almost unintelligible. The site of the skin removal from his abdomen became infected and caused him much discomfort.

At the time of the operation plaintiff was a 36 year old attorney engaged in the private practice of law and also holding a full-time position with the United States in the Philadelphia Procurement District. He eventually returned to his Government job and was able to continue in private practice with the assistance of other attorneys, but his efficiency and ability to perform the typical functions of a lawyer were greatly diminished. Plaintiff must wear an eye patch, and an obdurator is attached to his remaining teeth to assist in speaking and eating. His left cheek and upper lip droop and have been partially deprived of sensation. There has been a significant effect on his appearance and an impairment of his ability to read and speak, with consequent difficulty in attracting clients, reading, studying, writing and trying cases. The income from his private practice has been adversely affected, and he was recently forced to abandon his government career.

Far beyond any economic loss and the ending of hopes for advancement in his chosen profession are the dreadful limitations he has suffered in the enjoyment of his everyday life. Every mealtime is a time of difficulty, discomfort and embarrassment. His senses of smell and taste have been diminished, and he must lift his lip with his hand in order to place food in his mouth. Only one side remains on which he can chew. He is unable to control drooling and emission of food particles and mucous from his nose and mouth. Immediately after each meal he must irrigate the cavity with distilled water inserted through the orbital opening, which reaches into his mouth and throat. Irrigation at these and other times consumes about two hours a day.

He lacks bony protection against blows and he has lost the normal and automatic physical processes which filter and humidify the air one breathes, so that he is constantly exposed to infection and irritation. His home, office and car have had to be equipped with special humidifying devices. Driving and even walking on the street are especially hazardous for him. Strain on his one eye has forced him to give up reading for pleasure. He lives with the fear of a recurrence of cancer, and his self-consciousness regarding his appearance has forced him to withdraw even from his children. He rarely engages in social activity, and his participation in sports, physical activity and even work around the home inevitably has been greatly curtailed.

Plaintiff claims that these terrible injuries resulted from the negligence of the Government doctors. The negligence charged is not in the original insertion of umbrathor (Transcript, pp. 4–5), for the Government would not be liable for negligence committed when the plaintiff was engaged in military service.

(See Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950)). The negligence alleged is the failure, notwithstanding the repeated X-ray reports of a retained opaque substance in plaintiff's sinuses and his repeated complaints of serious symptoms, to take reasonable steps to determine the nature of the substance and to remove it.

The Government's defense is that the treatment rendered conformed to the standards of accepted medical practice prevailing at the time in this area. It contends that the carcinogenic properties of umbrathor were not generally known prior to 1956 and that the treating physicians in the Veterans Administration clinic had no reason to suspect that the retained opaque material might be anything other than a harmless iodized oil commonly used in X-ray studies. The Government also raises the defense that the plaintiff was contributorily negligent in failing to have an antrum wash performed when it was suggested and in failing to make regular visits to the clinic.

■■ The umbrathor which was inserted in 1944 turned out to be an extremely dangerous drug. Grave warnings of the hazards of its use had appeared in major medical journals in the 1930's, and new research and case studies confirming its carcinogenic properties were documented and reported in the 1940's. Long before 1957, when the ravages of the disease had made necessary the radical surgery upon the plaintiff, the Government doctors therefore should have been aware of the dangers of the drug. The Government should have reviewed the records of all patients to whom umbrathor had been given and warned them of the danger of its retention in their bodies. Accordingly, even if the plaintiff had never returned to a Government physician after his discharge from military service, there was a duty resting on the Government to follow up those cases in which umbrathor had been installed. The Government must be charged with knowledge that umbrathor had been used by its physicians at an earlier date, and its roentgenologists must have known of the danger of umbrathor. The negligence here is not in its installation, but rather in not having affirmatively sought out those who had been endangered after there was knowledge of the danger in order to warn them that in the supposedly innocent treatment there had now been found to lurk the risk of devastating injury. And if the otolaryngologists rendering day to day treatment in the Veterans Administration clinics might not pause to reflect upon the possible use of umbrathor, certainly the supervisory specialists in the Government's employ should be held negligent, and with them the Government, for not tracing back from its own records the identity of those patients who were exposed to it as a result of the Government's past action.

■■ I find also that the standard of care in the treatment of the plaintiff at the Veterans Administration clinic fell short of the proper and accepted medical practice in this area during the time of plaintiff's treatment. To the contention that the clinic physicians could reasonably assume that the retained substance was a non-radioactive iodized oil in common use for X-ray purposes, a ready answer is that the Government cannot interpose the defense that its right hand did not know what its left hand was doing. Under the Tort Claims Act, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances * * *." (28 U.S.C. § 2674). Surely a large corporation could not hide behind its size and the far-flung nature of its operations and facilities and say that it was not bound by the knowledge of some of its agents because they did not communicate their knowledge to other agents of the corporation. Moreover, had the clinic physicians taken the ordinary steps of obtaining and employing the past medical records of its patients, they would have learned that the opaque material was umbrathor. The Veterans Administration claims folder relating to the

plaintiff was available to the clinic physicians; indeed it was kept in the same building. It contained the St. Albans record which gave conspicuous notice—indeed a warning—that umbrathor had been inserted in the plaintiff's sinus. In a few minutes the trail would have been opened to the discovery of the reason for the plaintiff's continuing complaints. Yet in all the numerous visits which the plaintiff made to the clinic and through all the treatments he received, extending over a period of 12 years, not once was this record sent for by a treating physician. If it be said that continued complaints for no apparent physical reason may not be unusual, there remains no answer to the conceded fact that during all this time repeated X-rays revealed the presence of an opaque substance, although ordinarily contrast material in the sinus is absorbed naturally within a relatively short time.

■ The explanation for the failure to obtain the claims folder is clear to me from the evidence. The Veterans Administration personnel were overworked and had more matters to attend to than they could adequately handle. I refuse to apply a lower standard of medical practice to Government physicians than that which prevails in private practice in this area. The failure or neglect to obtain complete records, especially in recalcitrant cases, is not to be condoned and is not the proper and accepted medical practice in this area. Moreover, the Veterans Administration administrative personnel, knowing that the Veterans Administration clinic was understaffed, should have seen to it that the entire medical history contained in the claims folders was inserted into the current treatment folders, rather than wait for possible individual requests for complete records. The practice which was followed regarding past records was probably based on the view that in most cases no harm is done. Nevertheless it must be condemned as improper practice; and when harm *is* done, that harm is clearly the result of a want of due care.

■ Moreover, on one occasion long after the dangers of umbrathor should have been well known, a Government physician actually reviewed the St. Albans record which showed that umbrathor had been inserted in the plaintiff's sinus in September 1944. In September 1953 Dr. Towsen examined the plaintiff to review his disability rating for pension purposes. His notations on the clinic record show that he obtained and reviewed the plaintiff's claims folder, including the St. Albans record. He expressly noted that radiopaque material had been inserted in the plaintiff's sinus in September 1944 and that a recent X-ray revealed the presence of radiopaque material in the antrum. (P.'s Exh. 7b; Transcript, p. 58). But he did not inform the treating physician that the material was umbrathor. I do not believe the work of Government physicians can be so compartmentalized that Dr. Towsen's knowledge of danger can be disregarded because he himself had examined the plaintiff only for pension purposes. His failure to alert the treating physician to the danger was unreasonable, as was the failure of the treating physician to take notice of and act upon Dr. Towsen's notation. Dr. Towsen's notes in the treatment folder with which the treating physicians dealt placed them on notice as of September 1953 that the material had remained in plaintiff's sinus since 1944 and that the record of its original insertion was readily obtainable. Finally, this incident confirms the ease with which vital additional information could have been obtained by the treating physicians.

■ Even if it could be said that the clinic doctors were justified in their ignorance of umbrathor and in their assumption that the retained material was a non-radioactive iodized oil such as lipiodol, I find from the expert medical testimony that they were negligent in failing to remove the substance from plaintiff's sinus in 1948 and 1953.

The retention of any such substance over a long period of time was a signal

that special procedures were necessary for its removal, for such substances normally disappear rapidly by natural processes of absorption. In addition, plaintiff had serious complaints over a long time and the existence of the opaque material in his antrum hindered observation of the condition of his sinus and of the progress of any polyps that might have been present. And although lipiodol is non-radioactive and non-carcinogenic it is nevertheless an irritant which over a long time could cause a polyp to become a non-malignant tumor. Finally, the addition of bloody discharges to plaintiff's complaints in 1953 was an alarm which should have signalled the need for thorough diagnostic procedures and, at the minimum, a cleaning out of plaintiff's left antrum. Even in 1953 no preventive measures were taken.

Accordingly I find that the defendant was negligent. I find also that plaintiff was not contributorily negligent. Defendant failed to sustain its burden of proving that plaintiff neglected to take reasonable precautions for his own safety. I find that plaintiff acted reasonably in seeking treatment whenever he felt it to be necessary and that he returned to the clinic whenever he was directed to do so. His refusal to undergo the antrum wash pending a ruling on his request for private treatment was reasonable under all the circumstances. He was not advised of any danger or even of the existence of the retained opaque material. No reason was given for the suggested antrum wash, and after his request for private treatment was denied, the suggestion of an antrum wash was never renewed.

This brings me to the question of damages. The past medical expenses have been largely borne by the Government, except for those relating to the operation. In the future plaintiff will require regular checkups. There is the likelihood, at the best, of passing infections which will require treatment. In any event, as an element of damage, the medical expenses, past and future, are small in relation to the magnitude of the injury.

The plaintiff claims to have spent $6,000. to equip his home, office and automobile with air conditioning, dust control equipment and humidifiers, made necessary by his physical condition resulting from the operation. Presumably there will be some future expense in this area but apparently it will not be substantial.

Loss of earnings in the past are limited to whatever loss occurred in his income from private practice. There was no substantial loss of past income from his Government employment. The plaintiff had accumulated leave and although he had terminated his employment with the Government he was still receiving pay at the time of trial. While holding his Government position the plaintiff practiced law after hours and during periods of leave, which he took when the need arose. He specialized in negligence cases and apparently tried negligence actions. His net annual profits in the seven years from 1956 to 1962 ran from a trifling amount of one, two and three thousand dollars, and in one year reached almost $12,000. Inevitably, this income was less than what it would have been if he had not suffered from his injury.

In the future, plaintiff will have no further income from his Government position, but all his time, to the extent his disability permits, will be available for private practice. He clearly will not be able to conduct a full scale practice. There is a scarcity of concrete evidence on what the plaintiff might have made in private practice in good health. Before the operation he was newly admitted to the bar and devoted most of his time to his Government employment. We know, however, that he was ambitious enough to undertake the study of law after obtaining a degree in engineering. We know that he was industrious from this and the additional fact that he sought to augment his income by private practice in addition to his full-time position with the Government. There is evidence of his ability not only in his admission to the bar but also in the commendations he received as a Government attorney. I have no doubt that either in full-time private practice

or in part-time private practice and Government work, plaintiff could have earned a net amount of approximately $18,000, annually. Indeed, but for his injury, his Government salary alone might have approached that amount.

Plaintiff is presently 43 years of age. In 1955, when he was 35 years old, his life expectancy under the life tables was 36.3 years. (Transcript, p. 669). I shall assume that but for the injury he would have been able to work for at least 20 years in the future and would have earned approximately $18,000. annually. Assuming that with his present disability his net earnings will be not much more than what he had been able to earn in his part-time practice, his lost future earning capacity is approximately $15,000. per annum. This reduced to present worth at 6% under the Pennsylvania rule[2] is $172,050. I believe his damages should include this amount even if his life and work expectancies have been reduced as a result of the injury. He is entitled to recover damages based on what he would have been able to earn in the future but for the injury.

The Government claims a credit for past and future veterans disability payments to the plaintiff. It is abundantly clear from the decisions that the Government is entitled to this credit and that the award to the plaintiff must be diminished by the total amount of the past disability payments and the present worth of the future disability payments.[3] The past disability payments amount to approximately $32,370. The future disability payments, of course, must be estimated and reduced to their present worth at the rate of 6% per annum under the Pennsylvania rule and not at 4%, as the Government has calculated it. I shall accordingly credit the Government in the total amount of $84,928.

The item of pain, suffering, disfigurement and inconvenience is, of course, the most substantial element in the case. It is a heavy responsibility to express in monetary terms an equivalent for the agony which plaintiff has endured and the anguish and suffering which will accompany him throughout his life. This duty ordinarily is discharged with the advantage of the composite judgment of 12 jurors. In a Federal Tort Claims Act case, however, it must be performed by the trial judge alone. (28 U.S.C. § 2402).

I have already described the nature of the injury which plaintiff has sustained and the suffering which has befallen him. No useful purpose would be served by undertaking a restatement in medical or layman's terms, or by describing in greater detail their obvious effects upon the plaintiff. It is helpful, however, to consider the period that has passed separately from the future. In the first five years after the operation he endured the actual physical pain and suffering of the operation itself and the torment of the fear of its recurrence. Since that time the probability of recurrence has been greatly reduced. But in all of the time since the operation the actual disfigurement and incapacity as well as the serious inconveniences to the plaintiff in his everyday life have followed him. In all his future years he will continue to suffer the same disfigurement and incapacity as he does now. I have carefully considered the elements involved in his past and future pain, suffering, disfigurement and inconvenience and I add an award for this to the monetary damages already discussed, after credit to the Government for the disability payments, and find in favor of the plaintiff and against the defendant in the total amount of $725,000.

2. See Gregorius v. Safeway Steel Scaffolds Co., 409 Pa. 578, 585, 187 A.2d 646 (1963), reaffirming the rule of Windle v. Davis, 275 Pa. 23, 29, 118 A. 503 (1922), and Murray v. Philadelphia Transportation Co., 359 Pa. 69, 58 A.2d 323 (1948).

3. See, e. g., United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954), especially footnote at p. 111; Brooks v. United States, 337 U.S. 49, 53–54, 69 S.Ct. 918, 93 L.Ed. 1200 (1949); Knecht v. United States, 242 F.2d 929, 931 (3d Cir. 1957).

**544**

## Action on Requests

The Facts and the Law as stated in the foregoing Opinion shall be deemed Findings of Fact and Conclusions of Law.

In addition, I affirm plaintiff's Requests for Findings of Fact Nos. 1–7 incl., 8 as modified by substituting "iodized oil" for "radiopaque material", 9–18 incl., 20–43 incl., 45–48 incl., 50–52 incl., 54–65 incl., 67–76 incl., 77 as modified so that the first sentence shall read: "Plaintiff's disabilities, which were proximately caused by the negligence of defendant, also have interfered and now interfere with the conduct and pursuit of his private practice as an attorney in the following respects:", and 78–85 incl.

I deny plaintiff's Requests for Findings of Fact Nos. 19 to the extent not otherwise covered, 44, 49, 53 and 66.

I affirm plaintiff's Requests for Conclusions of Law Nos. 1–4 incl.

I affirm defendant's Requests for Findings of Fact Nos. 1–5 incl., 6 as modified by correcting the name of the institution to "Southern Division of the Albert Einstein Medical Center of Philadelphia", 7–22 incl., 23 as modified by substituting "but did not find any objective evidence" for "and were unable to find objective evidence", 24, 27 as modified by inserting "necessarily" after "does not", 38 as modified by adding at the end of the sentence: "from the maxillary sinus", 40, 42, 48, 50–52 incl., 55 as modified by inserting "completely" before "disabled" and eliminating the remainder of the sentence after the words "functioning as an attorney", 58, 62–63 incl., and 66 with the limitation that the present value of future payments has been computed at a rate of 4% per annum.

I deny defendant's Requests for Findings of Fact Nos. 25, 26, 28–37 incl., 39, 41, 43–47 incl., 49, 53–54, 56–57, 59–61 incl., and 64–65.

I affirm defendant's Request for Conclusion of Law No. 1.

I deny defendant's Requests for Conclusions of Law Nos. 2, 3 and 4, and alternate Requests 1 and 2.

## ORDER

And now, June 17, 1964, the Court finds defendant, United States of America, negligent and the plaintiff, Nathan Carl Schwartz, free from contributory negligence and assesses damages in favor of plaintiff and against defendant in the amount of $725,000.