Georgia C. **BROWN**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 66 C 385(2).

United States District Court
E. D. Missouri, E. D.

Aug. 9, 1968.

———◆———

James A. Stemmler, Stemmler & Stemmler, St. Louis, Mo., for plaintiff.

Irvin Ruzicka, Asst. U. S. Atty., Veryl L. Riddle, U. S. Atty., St. Louis, Mo., for defendant.

## MEMORANDUM

MEREDITH, District Judge.

This is an action under the Federal Torts Claims Act, 28 U.S.C. § 1346. Georgia C. Brown is suing for the alleged wrongful death of her husband, James Brown, who died on November 6, 1965. The case was heard by the Court without a jury.

James Brown was on active duty with the United States Army until 1957. He was placed on a temporary discharge in that year due to physical disability, and finally given a complete discharge in 1963. In 1960 and 1961 his legs had been amputated above the knees. Medical treatment was provided to James Brown by the Veterans Administration. He was under the regular care of Dr. Joseph Levitt at the Veterans Administration outpatient clinic at 415 Pine Street, St. Louis, Missouri. From 1962, or early 1963, until his death, the frequency of visits made by James Brown to Dr. Levitt and the Veterans Administration outpatient clinic varied from as often as two or three times a week to once every two or three months.

James Brown was, and had been, chronically ill for several years. A chronic illness is one of a lasting condition for a period of weeks, months, or years, as compared to an acute illness, which is a rather sudden and dramatic change in the patient's condition. James Brown was a diabetic, whose condition

was controlled by diet and medication. He also had arteriolosclerosis generalized, arterial sclerotic heart disease, and chronic bronchitis. He was suspected of having emphysema, and had been urged to cut down on his rather heavy smoking and drinking.

James Brown made a regularly scheduled visit to Dr. Levitt at the Veterans Administration outpatient clinic on October 29, 1965. He complained of lack of strength and lack of normal ability and drive. His temperature and blood pressure were taken, and Dr. Levitt listened to his heart and his chest with a stethoscope. James Brown's heart sounded normal and his chest clear. A chest x-ray was taken during that visit which showed that his heart was enlarged. However, it was known that James Brown's heart had been moderately enlarged for some time and testimony did not indicate whether the enlargement had greatly increased as shown in the x-ray taken that day. An electrocardiogram taken in April of 1965 by Dr. Levitt was abnormal in that it contained an atypical T-wave pattern which indicated an insufficient blood supply to the heart muscle (myocardial ischemia).

James Brown returned to his home on October 29th following the visit to the Veterans Administration outpatient clinic. He remained in bed and slept constantly. It normally took a couple of days for him to recuperate from the exertion of the visit to the outpatient clinic. Mrs. Brown called Dr. Levitt on November 3, 1965. Dr. Levitt desired to examine James Brown at the outpatient clinic. However, Mrs. Brown did not feel that she could transfer him from his wheelchair to the car by herself. Ambulance service, due to internal control procedures, was available only to take a veteran to the hospital. Dr. Levitt called Cochran Veterans Hospital and arranged for an ambulance to be dispatched. The doctor did not send James Brown to the hospital to be examined by the more complex tests which are generally associated with an examination in a hospital as opposed to an examination at an outpatient clinic. He was sent to the hospital because of the inconvenience to Mrs. Brown in transporting him to the outpatient clinic.

Dr. Robert J. Cook examined James Brown at Cochran Veterans Hospital. He was familiar with the patient's medical history. He discovered that James Brown had been examined at the outpatient clinic on October 29th and a chest x-ray taken. He asked Brown about breathing, shortness of breath, cough, pains, and what changes had occurred since he had been examined at the outpatient clinic. James Brown felt that he had a cold and his wife thought that he had pneumonia. An examination revealed that James Brown was not pale or cyanotic or sweaty; he was not dyspneic; his chest sounded good and no signs of fluid were heard; his heart sounded good; his pulse was good; his abdomen was soft, but not distended by fluid. Dr. Cook called the outpatient clinic and talked with the chief x-ray technician about the x-ray taken on October 29th. Dr. Cook testified that his examination revealed that James Brown was chronically ill, but that his condition was not acute. Cough medicine was prescribed and James Brown was instructed to return later if he felt worse.

Mrs. Brown called a local physician, Dr. Clark, at 10:00 p. m. on November 3, 1965. Dr. Clark made a house call and examined James Brown that night. Dr. Clark prescribed an antibiotic and instructed Mrs. Brown to keep her husband breathing good. Later James Brown began to have delusions, seeing snakes and people in the room. He kept getting worse and was dropping cigarettes in the bed. Mrs. Brown called the Veterans Administration at Twelfth and Clark Streets in St. Louis, at approximately 1:30 a. m., on November 4th, and requested an ambulance to take her husband to the U. S. A. F. Hospital at Scott Air Force Base, Illinois.

James Brown arrived at the United States Air Force Hospital at Scott Air Force Base, Illinois, at 3:30 a. m., on November 4, 1965. Mrs. Brown told the

doctor at the hospital that she believed that her husband had pneumonia. She told him that James Brown was having delusions. His skin was a dirty gray, and that it was necessary to hold the cigarette in his mouth so that he could smoke. The examination conducted by the Air Force doctor on duty in the emergency room was very thorough. The plaintiff's expert witness, Dr. George Charles Oliver, Jr., testified that the examination was very complete. As a part of the examination a chest x-ray was taken. That x-ray showed that the heart was abnormally enlarged. It was compared with a chest x-ray taken at that hospital on February 3, 1964. The radiographic report stated that the heart was essentially unchanged when compared with the x-ray taken on February 3, 1964. The x-ray indicated that the lungs were clear. Testimony at the trial was offered in an attempt to prove that the result of the comparison of the November 4, 1965, x-ray with the February 3, 1964, x-ray was not correct. Dr. Oliver and Dr. Levitt testified that the heart was much larger in the November 4, 1965, x-ray than it was in the February 3, 1964, x-ray. It was revealed that the two x-rays were taken by different techniques, and that comparison of the two could not be accurate without knowledge of and taking into account the difference in the technique. As mentioned above, it was known that James Brown had an enlarged heart for some time. Testimony indicated that this was a progressive development. The plaintiff failed to show that the diagnosis of the x-ray by the Air Force radiologist was incorrect.

The doctor at the emergency room determined that James Brown did not have pneumonia. The records of the examination indicate that hospitalization was not considered appropriate and that it was recommended that an appointment be made at the clinic for further evaluation. James Brown returned home.

Mrs. Brown called Dr. Dominic J. Verda, on November 5, 1965, and told him over the telephone that her husband had been given an antibiotic injection for pneumonia by a private physician and since then had become worse and was mentally confused. Dr. Verda did not know whether James Brown was going into a diabetic coma, and made arrangements for James Brown to be admitted to Bethesda General Hospital at 3655 Vista Avenue, St. Louis, Missouri. James Brown died at 9:00 p. m., November 6, 1965. A post-mortem examination revealed that death was caused by an acute myocardial infarction and acute left coronary occlusion. The death certificate requested that the examining physician estimate the length of time from onset of the fatal cause to the time of death. Dr. Verda, after assisting a pathologist with the post-mortem examination, estimated the time between onset and death to be ten days.

The plaintiff contends that this is not the usual type of malpractice action. She bases her theory of recovery, at least in part, on the negligence of the defendant in not supplying the physicians who examined James Brown with information contained in the medical records at the outpatient clinic and known to Dr. Levitt. Schwartz v. United States, 230 F.Supp. 536 (E.D.Pa.1964), is cited in support of the contention that this case is not governed by the normal principles of medical malpractice. In that case, the Court found that the United States was negligent in failing to discover from government medical records the presence of a highly damaging radioactive contrast dye, which had been placed in the plaintiff's sinus at a Naval Hospital in 1944. The plaintiff in that case made numerous visits to Naval and Veterans Administration hospitals between 1945 and 1956, with severe complaints concerning his sinus. During the entire eleven-year period no attempt was made to consult the prior medical records, which clearly recorded the presence of the dangerous radioactive dye.

This present case is very different from the situation in the *Schwartz* case. In this action we are concerned with visits to emergency rooms to determine the necessity for immediate hospitaliza-

tion. In *Schwartz* the Court was confronted with a prolonged search for the cause of the plaintiff's complaint, which lends itself easily to a review of past medical records. The situation in an emergency room, or admitting office of a hospital, is very different. The doctor's role in this situation does not permit a detailed search of records and other sources of pertinent information in every instance. The quality of the doctor's decision will, of course, be enhanced by the more information he has at his disposal. Whether the doctor should obtain such information, or whether a referring physician should see that certain information is made available, must be judged by the medical standard which is required of medical personnel as developed in the malpractice area.

The plaintiff's expert witness, Dr. Oliver, testified that had James Brown been given an electrocardiogram at either Cochran Veterans Hospital on November 3, 1965, or at U. S. A. F. Hospital at Scott Air Force Base on November 4, 1965, it would have been revealed that he was having a heart attack and that immediate hospitalization would have enhanced the survival factor. Dr. Oliver further stated that, had the examining physicians been aware of the abnormal electrocardiogram taken by Dr. Levitt in April of 1965, and had they been informed that James Brown had very suddenly become very short of breath, an ordinary, skillful and prudent medical doctor would have suspected a coronary occlusion and taken an electrocardiogram. Dr. Oliver testified that the examination performed at the U. S. A. F. Hospital at Scott Air Force Base was very thorough. His only criticism was that, had the doctor known of the April electrocardiogram and of a sudden shortness of breath, he should have taken his own electrocardiogram. The examining doctor did not know of the abnormal electrocardiogram taken by Dr. Levitt in April. He made a very thorough examination under the circumstances, he even took an x-ray and had it compared to previous x-rays of James Brown, which were on file at the

hospital. There is no evidence that the shortness of breath was called to the attention of the examining doctor, or was present at the time of his examination. There is no evidence of medical malpractice by the examining physician at the U. S. A. F. Hospital at Scott Air Force Base, Illinois.

The only possible question about medical malpractice concerns the visit to Cochran Veterans Hospital on November 3, 1965.

■■ A physician is required to use that degree of care and skill which is used and exercised by the ordinary skillful, careful, and prudent physician acting under the same or similar circumstances. Rauschelbach v. Benincasa, 372 S.W.2d 120 (Mo.1963); Williams v. Chamberlain, 316 S.W.2d 505 (Mo.1958). As long as the physician properly exercises the required degree of skill, he is not liable for an honest error of judgment. The making of a diagnosis is largely a matter of judgment, and even if there is an erroneous or mistaken diagnosis, the mistake must be negligent to create liability. Williams v. Chamberlain, supra; Sibert v. Boger, 260 S.W.2d 569 (Mo.1953). This standard of skill required in diagnosis has been applied to a case involving diagnosis and treatment of disease of the heart and vascular system. See Haase v. Garfinkel, 418 S.W.2d 108 (Mo.1967). The Missouri Supreme Court in that case held that as long as there was room for an honest difference of opinion among competent physicians, a physician who used his own best judgment cannot be guilty of negligence, even if it subsequently developed that he was mistaken.

The possible grounds for supporting medical malpractice advanced by the plaintiff concerning the visit to the Cochran Veterans Hospital on November 3, 1965, and the subsequent diagnosis by Dr. Cook are: (1) failure to obtain and utilize certain information contained in James Brown's medical records at the outpatient clinic, specifically the April electrocardiogram and the chest x-ray taken on October 29, 1965; (2) failure

on the part of Dr. Cook to contact Dr. Levitt; (3) failure of Dr. Levitt to contact the admitting physician at the hospital and relay certain symptoms or information in the medical records at the clinic; and (4) failure of Dr. Cook to take an electrocardiogram which would have indicated hospitalization.

Whether these omissions were a breach of the duty which a physician owes to his patient depends upon whether the particular doctor involved used that degree of care and skill which would have been used by the ordinary skillful, careful, and prudent physician in the same or similar circumstances. The plaintiff's expert witness, Dr. Oliver, testified that whether the ordinary skillful, careful, and prudent physician would have given James Brown an electrocardiogram depended upon the degree of suspicion which the doctor had at the time he examined Brown. Dr. Oliver testified that in the case of a patient with the medical history of James Brown, "the mere fact that he has suddenly taken a turn for the worse or becomes suddenly very short of breath has to raise a suspicion that something very acute has happened", and that one would have to suspect the presence of a coronary occlusion. If the presence of a coronary occlusion had been suspected, then proper medical standards of diagnosis would have required that an electrocardiogram be given.

The crucial factor in this case is the suddenness of a change for the worse or the patient becoming "suddenly very short of breath." The testimony of all the witnesses clearly indicates that James Brown was chronically ill and slowly going downhill. He had a chronic chest disease, was suspected of having emphysema, and had been urged to cut down on his smoking and drinking. The testimony surrounding the visit to Cochran Veterans Hospital on November 3, 1965, does not contain any facts from which the Court can find that a sudden change for the worse or a sudden very shortness of breath was reported to Dr. Cook. Dr. Cook inquired of the changes since James Brown had visited Dr. Levitt at the out-patient clinic on October 29, 1965. He listened to James Brown's heart and he also called and inquired about the chest x-ray taken on October 29th. He testified that even had he been aware of the April electrocardiogram and of the enlarged heart shown by the October 29th chest x-ray, he probably would not have hospitalized James Brown or given him an electrocardiogram. The x-ray and the electrocardiogram were consistent with his knowledge of James Brown's chronic condition and medical history. There is no evidence that absent the knowledge of a sudden change or a sudden acute shortness of breath, his action would not have been perfectly proper.

There remains however, the question as to whether Dr. Levitt was informed of a sudden change for the worse or a sudden acute shortness of breath. Had Dr. Levitt been aware of such sudden change or sudden acute shortness of breath, it would have been his duty to see that the doctors at Cochran Veterans Hospital were aware of this fact and of his personal knowledge about James Brown's heart problems. Dr. Levitt testified that Mrs. Brown called him at the clinic on November 3, 1965, and told him that James Brown was worse and probably told him that he was having difficulty breathing. There is nothing to indicate that the symptoms as reported indicated a sudden departure from James Brown's chronic symptoms. The testimony indicates that the reported symptoms were consistent with the past medical history and complaints. Shortness of breath was part of the medical history of James Brown. He had a chronic lung condition, and his discharge and pension from the United States Army were based to the extent of thirty percent on this chronic lung condition.

The plaintiff cites several cases which hold that where the symptoms are consistent with either of two possible conditions, due care demands that a doctor do more than make a short examination and release the patient. See Hicks v. United States, 368 F.2d 626 (4th Cir. 1966). These cases are not controlling

in this situation because the Court finds that the evidence does not indicate that there was a reported sudden change, or sudden acute shortness of breath, which would have alerted the treating physicians to a possible acute change in the condition of James Brown.

The plaintiff has failed to sustain her burden of proving that the defendant's doctors and medical personnel failed to comply with the proper medical standard of diagnosis and care. Accordingly, the plaintiff's cause of action will be dismissed.