**Nathan J. SCHNURMAN, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 79–0487–R.

United States District Court, E. D. Virginia, Richmond Division.

June 2, 1980.

**430**

John A. Heilig, Rixey & Heilig, and John F. Rixey, Norfolk, Va., for plaintiff.

Raymond A. Carpenter, Eliot Norman, Asst. U. S. Attys., Richmond, Va., for defendant.

### MEMORANDUM

MERHIGE, District Judge.

Plaintiff, Nathan J. Schnurman, seeks recovery from the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.*, for injuries allegedly resulting from his exposure to toxic war gases during a United States Navy experiment in 1944.

Plaintiff's seven count complaint alleges that the United States, through the Department of the Navy, was negligent in failing to provide plaintiff with follow-up examination, treatment, supervision or to warn him of the risk of physical injury presented by his exposure to mustard gas in the 1944 experiment. In addition, plaintiff seeks damages for alleged violations of his constitutional rights committed in allegedly subjecting plaintiff to war gas experimentation without his knowledge or valid consent. A final claim alleges that the United States deliberately concealed from plaintiff the true nature of the gas to which he was exposed and the potential hazards of such exposure. Plaintiff seeks recovery of five million dollars in damages plus costs.

The Government moved for a dismissal of the complaint on two separate grounds. First, the Government contended that the action was barred by the applicable two year statute of limitation under 28 U.S.C. § 2401(b). Second, it claimed sovereign immunity from tort liability for service-related torts under the *Feres* doctrine, *see Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Finding the record in support of such motion incomplete, the Court denied the Government's motion to dismiss and set the case for trial on the merits. After a three-day trial, the Government renewed its motion to dismiss on the aforementioned grounds under Rule 41(b), Fed.R.Civ.P. Plaintiff relied upon his pretrial response, and the Court finds the matter ripe for disposition.

### I. FACTUAL BACKGROUND

In January, 1944, plaintiff, then a Seaman Apprentice in the Navy, and others, volunteered for a naval experiment designed to test the effectiveness of certain protective clothing when exposed to sulphur mustard gas. The United States government anticipated the use by the Axis powers of such a toxic war gas during the latter stages of World War II and several branches of the Armed Services were testing clothing designed to neutralize the caustic effects of such gases. Due to the strategic importance of these experiments, the Navy deemed it inappropriate to inform potential volunteers as to the precise nature of the tests. Instead, plaintiff and the other volunteers were led to believe that they would be testing uniforms for use in tropical climates.

In January 1944, plaintiff was taken by bus from Bainbridge, Maryland, where he was stationed following boot camp training, to a Navy research laboratory in Anacostia, Maryland, the site of the experiment. There he and the other volunteers were given clothing, a bunk in a quonset hut, and a blanket. The experiments began the following day. Plaintiff was given an initial physical examination prior to testing. This examination consisted of a blood test, heart and blood pressure check, and routine inspection of eyes, ears, and lungs. He was then issued the protective clothing, consisting of specially treated pants, jacket with hood, underwear and socks, plus boots, gloves and a gas mask.

After proper fittings and testing of the gas masks, the volunteers, numbering ten, were led to the experimentation building. The building itself was a simple structure with an entrance platform and test chamber. A single door separated the platform from the chamber and an intercom allowed for communication between the subjects inside the chamber and the corpsmen on the platform. The subjects were told that, once inside, a vapor was to be introduced into the chamber and that they were to remain in the chamber for one hour. The subjects were not told what the vapor was, but were told that it might produce a slight irritation on the subjects' skin, similar to a sunburn. The subjects were admonished not to discuss the experiment with anyone.

Following a one hour exposure to the vapor, plaintiff and his fellow subjects were instructed to continue wearing the protective clothing for an additional four hours, during which time they would eat and pass the time in their quarters. Upon disrobing, the subjects were given a brief physical examination—primarily for the purpose of detecting any signs of erythema or burns on their skin.

The following morning, the subjects were given a physical and blood tests prior to that day's exposure to the gas. These blood tests were the last ones given to the men in connection with this experiment. The hour long gas exposures continued on a daily basis for the next four days without incident, save the departure of a few of the subjects due to painful burns. On one of those days, just prior to the morning's exposure, plaintiff was informed by a corpsman that they would be testing mustard and lewisite gas that day.

On the sixth test day, while inside the chambers, plaintiff's gas mask malfunctioned and plaintiff breathed the noxious vapor being tested. The inhalation of the gas produced extreme nausea and a burning in his eyes, nose and throat. Before being helped out of the chamber, plaintiff regurgitated in his mask. Once outside the chambers and free of his mask, plaintiff continued to experience nausea and dizziness, plus an intense pain in his chest. After further vomiting, plaintiff lost consciousness. No record was made of this incident.

Upon regaining consciousness, plaintiff was informed that he would no longer be needed for the experiment and that he could return to Bainbridge. He was not given any physical examination or treatment with the exception of local treatment for the minor burns on his skin. Plaintiff left the site of the experiment and traveled to his home in Roanoke, Virginia for a ten-day leave. In Roanoke, plaintiff received treatment by his family doctor for sores in his throat and nasal passages resulting from the inhalation of the mustard gas. While this condition improved several weeks later, plaintiff contends that he has suffered additional, more serious after-effects from the experiment. Plaintiff testified that he has experienced severe chest pains and shortness of breath ever since the incident in the test chamber. Although he complained frequently of these ailments during his service in the Navy, plaintiff received no medical treatment for his ailments.

The extent of plaintiff's physical misfortunes has not been limited to shortness of breath and chest pain. During the thirteen years immediately following his discharge from service in 1946, plaintiff was seen by general practitioners, a cardiologist and an

internist for complaints of dizziness, nerves, and numbness in his hand, in addition to the aforementioned chest pain and respiratory difficulty. In 1961, and again in 1964, plaintiff was hospitalized for the recurring chest pain. He continued to see cardiologists for tests and treatments and discovered, among his other maladies, that he had an irregular heartbeat.

Plaintiff made no mention of the mustard gas experiment to any of these treating physicians, heeding instead the admonition from his former superiors not to discuss the tests with anyone.

Plaintiff's physical problems seemed to multiply with the passage of time. In 1969, plaintiff injured his hips and legs in a motor vehicle accident. The following year, he was hospitalized under the care of a urologist for kidney stones. In 1971, he was twice hospitalized as an emergency patient. The first of these visits was for thrombophlebitis of his left leg, arising out of a work-related accident. During his hospitalization for this injury, plaintiff experienced a pulmonary embolus in his left calf, requiring a venal ligation in that leg. As a result, plaintiff must wear stocking-like leg supports to facilitate the circulation of blood in his legs. Plaintiff's second emergency hospitalization in 1971 was for the chest pain complained of previously.

The following year proved no better for plaintiff. He was hospitalized for colon problems and again for chest pains and kidney stones, the latter being removed at that time. In 1974, plaintiff returned to the hospital to have a pelvic cyst of his left kidney surgically removed. Recurring head pains and losses of equilibrium following this hospitalization prompted plaintiff to seek the assistance of a neurosurgeon towards the end of 1974. Brain scans conducted by this physician revealed that plaintiff suffered from cerebral atrophy of the brain. The cumulative effect of the aforementioned ailments on plaintiff's work performance forced him to retire from his salesman's position in 1974 at the age of 48.

Finally, in 1975, plaintiff made the first mention to an examining physician, Dr.

Alfred L. Smith, that he had been exposed to what he had been told was mustard and lewisite gas during a wartime experiment. Dr. Smith suggested that plaintiff's ailments could be related to this exposure and encouraged plaintiff to file a claim with the Veteran's Administration (hereinafter "V.A."). In order to substantiate his claim, plaintiff wrote to the Federal Records Center in St. Louis, Missouri, for information concerning his participation in this experiment. Although no mention of plaintiff's participation appears in his service records, the Federal Records Center did send him records reflecting that he had taken part in the testing of "Agent H." Unsure of the identity of Agent H, plaintiff wrote to the National Naval Medical Center in Bethesda, Maryland, for information concerning Agent H.

Without waiting for a response from the National Naval Medical Center, plaintiff filed his claim with the V.A. in September, 1975. Dr. Smith wrote a supporting letter to the V.A. in October, 1975, confirming that plaintiff had a history of heart problems and chest pains dating back to the date of the experiment. Plaintiff returned to the V.A. office on February 27, 1976, and, with the help of a veterans' benefits counselor, drafted a letter to the U.S. Navy Bureau of Medicine and Surgery seeking additional information concerning the pathological and neurological effects of exposure to Agent H. Plaintiff's letter, prepared by the V.A. counselor and signed by plaintiff, stated that his treating physician at that time, (Dr. Smith), had indicated that plaintiff's disabilities were the result of his gas exposure in 1944.

In July, 1976, plaintiff finally received confirmation from the government that Agent H was, in fact, sulphur mustard gas. On September 9, 1976, plaintiff reported this information to Dr. Smith, who, by letter dated the following day, reaffirmed his opinion that plaintiff's debilitating condition was a result of his exposure to the gas in 1944.

Plaintiff continued to suffer from chest pains and dizziness in the ensuing years.

Plaintiff's irregular heartbeat required the implantation of a pacemaker in August of 1977. In 1979, his arteriosclerotic heart condition required a major coronary bypass operation. In addition, plaintiff currently suffers from poor eyesight and bilateral hearing loss.

Plaintiff filed an administrative claim under the Federal Tort Claims Act with the Department of the Navy on September 13, 1978. The Department of the Navy having failed to make final disposition of plaintiff's claim within six months, plaintiff, on May 8, 1979, filed the instant tort action against the United States. The Government, as the Court has already stated, *supra*, unsuccessfully moved to dismiss the action prior to trial. At trial, plaintiff presented expert testimony in an attempt to prove a causative link between his exposure to mustard and the many physical maladies he has suffered from in the years since 1944. The Government's evidence was, on the other hand, directed toward establishing that plaintiff's brief exposure to the concentrations of mustard gas used in the test chamber could not have resulted in his subsequent afflictions. Further, the Government presented expert testimony that the toxicity of sulphur mustard does not manifest itself in the same debilities that plaintiff suffers from. The same experts testified that applying the state of knowledge of mustard's toxicity in 1944, there was no duty to warn plaintiff of any severe long-term effects of his exposure.

After trial, the Government renewed its motion to dismiss under Rule 41(b), Fed.R. Civ.P., based upon two separate arguments. First, it argues that under the applicable two year statute of limitations, plaintiff's filing of his administrative claim in September, 1978, and of the instant complaint eight months later, was time-barred due to his awareness of his injuries and their probable cause prior to September 1976. Second, the Government contends that plaintiff's injuries even if caused by the mustard exposure, are not compensable under the Federal Tort Claims Act as they are injuries which "arise out of or are in the course of activity incident to service."

*Feres v. United States, supra* at 146, 71 S.Ct. at 159. For the reasons which follow, the Court finds that recovery against the United States in the instant action is barred under both the statute of limitations contained in the Federal Tort Claims Act, and under the *Feres* doctrine of intra-military immunity.

## II. STATUTE OF LIMITATIONS

The Federal Tort Claims Act provides that a "tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues. . . ." 28 U.S.C. § 2401(b). Plaintiff filed his administrative claim with the Department of the Navy on September 13, 1978. For plaintiff's instant claim to be time-barred, therefore, it must have accrued prior to September 13, 1976.

The Government argues, with justification, that there is ample evidence to support a finding that plaintiff knew of his injuries and their probable cause well before September, 1976. In particular, the Government points to September 17, 1975, as the latest date when plaintiff made or had suggested to him a causal link between his infirmities and the 1944 experiment. On that date, plaintiff first mentioned to his physician, Dr. Alfred Smith, that he had participated in an experiment involving what he understood to have been mustard and lewisite. Dr. Smith apparently told plaintiff that exposure to those gases could have caused his physical disabilities. Indeed, plaintiff had enough confidence in this suggestion to file immediately thereafter a claim with the V.A.

On at least two occasions, plaintiff confirmed that such a diagnosis had been given him at the September, 1975, consultation with his doctor. In February, 1976, plaintiff went to the V.A. office in Richmond, Virginia, and consulted a veterans' benefits counselor about substantiation of his claim. The counselor typed a letter on behalf of plaintiff to the U.S. Navy Bureau of Medicine and Surgery to obtain documentary

evidence supporting his claim for benefits. This letter, dated February 27, 1976, and signed by plaintiff, stated, "my present doctor has indicated that my present disabilities are, in his opinion, the result of this gas exposure in 1944." Later, in December, 1977, plaintiff's wife summarized on his behalf the events relevant to his claim for purposes of acquiring congressional assistance. This summary contained the following statement: "My medical condition was diagnosed by Dr. Alfred A. Smith [in] September 1975, as systemic poisoning as direct effects of my exposure to these experiments." Defendants urge, and the Court finds, that plaintiff's claim against the government accrued at the latest by September of 1975.

Indeed, there is other evidence to support the Court's conclusion in this regard. In plaintiff's statement in support of his V.A. claim filed September 27, 1975, heretofore referred to, plaintiff recounted the details of the 1944 gas exposure and his physical reactions thereto, concluding with the assertion: "Breathing has continued to be labored since this occurrence." In testimony before the Board of Veteran's Appeals on May 18, 1978, plaintiff claimed that the chest pains he experienced in 1961 were "not new" but merely "a magnification or reaffirmation or continuation of" those he had suffered in 1944. Similarly, in deposition testimony taken in preparation for this litigation, plaintiff frequently described his recurrent chest pains as the same as those experienced in 1944, and claimed: "I had chest pains all my life per se since 1944." It is obvious therefore that plaintiff had made the connection in his own mind between the experiment and his ailments even prior to Dr. Smith's diagnosis of September 17, 1975.

Plaintiff, on the other hand, argues that he had no idea that his disabilities could have been related to the 1944 experiment prior to his visit to Dr. Smith in 1975. Further, plaintiff contends that while Dr. Smith suggested in 1975 a link between his injuries and exposure to mustard and lewisite, this diagnosis was not confirmed until mid-September, 1976, when Dr. Smith was informed of the true nature of Agent H, the experimental name for the sulphur mustard gas. Only then, plaintiff argues, did he have a "reasonable opportunity to discover *all* of the essential elements of a possible cause of action—duty, breach, causation, damages." *Bridgford v. United States*, 550 F.2d 978, 982 (4th Cir. 1977).

The Supreme Court recently had the opportunity to discuss the limitations period under the Federal Tort Claims Act in *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). The Court in *Kubrick* dealt with a veteran's claim factually similar to that of the instant plaintiff. The veteran, Kubrick, had received treatment in a V.A. hospital in 1968 for a bone infection. Shortly thereafter, he began to experience a ringing sensation in his ears, later diagnosed as bilateral nerve deafness. In 1969, an ear specialist informed Kubrick that it was highly possible that the hearing loss was the result of the 1968 treatment in the V.A. hospital. Kubrick's application to the V.A. for benefits proved unsuccessful. During the pendency of his administrative appeal in 1971, Kubrick was informed by another ear specialist that the 1968 treatment had in fact caused his hearing loss and that it should not have been administered. Kubrick subsequently filed suit under the Federal Tort Claims Act.

The Supreme Court in *Kubrick* held that Kubrick's claim accrued in 1969 when he was first informed of the likely connection between the 1968 treatment and his subsequent hearing loss. The running of the limitations period was held not to have been suspended until Kubrick learned in 1971 that such treatment was probably negligent. The Court, thus, reiterated that a claim accrues under 28 U.S.C. § 2401(b) as soon as a plaintiff has in his possession "the critical facts that he has been hurt and who has inflicted the injury." 444 U.S. at 118, 100 S.Ct. at 359.

■ The Supreme Court's holding in *Kubrick* represents a balance struck between the two competing interests implicit in any application of a statute of limitations. The

first of those interests is that of the plaintiff in seeking compensation for an injury inflicted upon him. Courts must guard against a premature application of a statute of limitations until such time as a plaintiff has a reasonable belief that he has a cause of action against the prospective defendant. And where that reasonable belief is delayed through the plaintiff's "blameless ignorance" of the fact of his injury or of the fact of its probable cause, the plaintiff will not be held to be prejudiced thereby. *Id.* at 117, 100 S.Ct. at 358; *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

The holding in *Kubrick,* however, reminds us that the second competing interest, that of the putative defendant in the prompt presentation of claims against it, must be deferred to whenever possible as it also serves the public interest. *Id.,* 100 S.Ct. at 357; *Guaranty Trust Co. v. United States,* 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938). The public interest is served by such a statute of repose as it ensures that the search for truth is not hindered by the loss of evidence, as by the disappearance of witnesses and documents, or otherwise. *Kubrick, supra* at 116, 100 S.Ct. at 357.

In the instant case, plaintiff knew of the nature of his injuries long before 1976. His respiratory, cardio-vascular, nerve and hearing problems had all been diagnosed and treated in the years following his discharge from the service. The only piece missing to plaintiff's puzzle was the link between his maladies and the 1944 experiment, which plaintiff suspected was the genesis of his ailments. That piece was supplied in September of 1975 by Dr. Smith, who, the Court finds, diagnosed plaintiff's problems as the direct result of exposure to the toxic war gas. It was at this time that plaintiff possessed the critical facts of injury and causation which would prompt a reasonable man to seek legal advice.

Accrual of plaintiff's cause of action did not, in the Court's view, await confirmation by the government that mustard was used in the experiment, nor did it await the September 10, 1976, diagnosis by Dr. Smith

that the disclosed components of the experimental gas confirmed his earlier judgment. That plaintiff was already in possession of the *critical* facts concerning his injury and its alleged cause is demonstrated by his prompt claim with the V.A. for veteran's benefits. This court cannot, as sympathetic as it may be, legally justify excusing plaintiff from just as promptly seeking relief from the suspected tortfeasor through the legislatively provided mechanism under the Federal Tort Claims Act. His failure to do so until nearly three years later proves, in the Court's view, fatal to his instant claim.

While the statute of limitations under 28 U.S.C. § 2401(b) bars recovery in the instant action, there is still another principle which, even absent the Court's conclusion reference the statute of limitations, bars a recovery for the plaintiff which, in the interest of a complete record, the Court now addresses.

### III. SOVEREIGN IMMUNITY UNDER *FERES*

The Government's claim of immunity from tort liability in the instant case is based upon *Feres v. United States, supra,* in which the Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.* 340 U.S. at 146, 71 S.Ct. at 159. *Feres* involved three separate cases in which servicemen or their estates brought suit against the government for service-connected negligence. Recovery for the government's negligence was disallowed under the Federal Tort Claims Act.

The Supreme Court recently expanded its initial rationale for the *Feres* doctrine in *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), to include three underlying factors. First, the "distinctively federal" relationship between the government and its servicemen was held incompatible with applying a different state's law under that Act to a particular tort claim, depending upon where the soldier was injured.

*Feres, supra* 340 U.S. at 143, 71 S.Ct. at 157. Second, statutory bases of compensation, such as the Veterans Benefits Act, provide an adequate substitute for tort liability. *Stencel Aero Engineering, supra* 431 U.S. at 671, 97 S.Ct. at 2057. Third, the "peculiar and special relationship" between a soldier and his superiors, and military discipline would be intruded upon by the spectre of tort liability for government negligence in the course of military duty. *Id.; see United States v. Brown,* 348 U.S. 110, 112, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954).

The Government argues here that *Feres* bars any recovery of damages for injuries caused by plaintiff's exposure to mustard gas during the 1944 in-service test. Plaintiff seeks to avoid the *Feres* bar under two theories of recovery. First, plaintiff contends that *Feres* applies only to negligence actions and presents no obstacle to a claim of constitutional violations as is contended to be present here. Second, plaintiff argues that two separate torts are involved in this action: the initial alleged tort resulting in plaintiff's exposure during the mustard gas tests, and a second continuing alleged tort of a failure by the government to warn plaintiff after discharge of the latent dangers of mustard exposure or to provide follow-up treatment of plaintiff's resulting injuries.

■ After examination of the relevant case law under the *Feres* doctrine, the Court concludes that there is no exclusion from *Feres* immunity for claims of violations of constitutional rights as plaintiff suggests. Indeed, Courts have uniformly held that the *Feres* bar covers constitutional as well as intentional torts. *Thornwell v. United States,* 471 F.Supp. 344, 348 (D.D.C. 1979); *see Citizens National Bank of Waukegan v. United States,* 594 F.2d 1154 (7th Cir. 1979); *Jaffee v. United States,* 592 F.2d 712 (3d Cir.), *cert. denied* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979); *Misko v. United States,* 453 F.Supp. 513 (D.D.C. 1978). As reasoned recently in *Thornwell, supra,* "neither the language nor the rationale of the Court's [*Feres* ] decision indicates that the legal theory of a soldier's claim

ought to be a salient factor in determining the scope of intra-military immunity." *Id.* at 348.

■ Plaintiff's continuing tort argument presents a more difficult question. The Court finds, initially, that *United States v. Brown, supra,* is inapposite to the factual record presented by plaintiff and does not compel removal of the *Feres* bar. *Brown* involved a suit under the Federal Tort Claims Act brought by a serviceman whose service-connected leg injury was aggravated by a post-discharge treatment of that leg in a V.A. hospital. The injury held actionable under the Act was the post-discharge negligent medical treatment and not the original service-connected injury. Plaintiff's injuries, on the other hand, were allegedly caused by the government's in-service conduct in 1944 and were simply left unmonitored and untreated after discharge.

The case of *Schwartz v. United States,* 230 F.Supp. 536 (E.D.Pa.1964) and the recent case of *Thornwell, supra,* however, do support allowing recovery, despite *Feres,* for a post-discharge failure to warn of or to treat service-connected injuries. *Schwartz* dealt with an ex-serviceman who developed cancer from a dangerous drug that had been injected into his sinuses while he was in the service. The district court found negligence under the Federal Tort Claims Act in the government's failure to seek out and to warn Schwartz of the risks of injury discovered after his discharge to be inherent in the supposedly innocent treatment. *Feres* was thus held not to bar recovery for this post-discharge negligence.

*Thornwell* involved a suit by an ex-serviceman against the United States and others to recover for the mental and physical illnesses allegedly caused by the secret, nonconsensual, in-service drugging of Thornwell with LSD. While dismissing Thornwell's claim for injuries occurring while on active duty, Judge Richey held that *Feres* would not bar recovery for injuries which resulted from the government's failure to provide him with any follow-up examinations, supervision, or other medical treatment during the seventeen years after his

discharge. The court found this post-discharge tort of negligence separate and distinct from the initial intentional tortious conduct concerning the experimentation with LSD upon Thornwell.

Without commenting on the compatibility of such holdings with the *Feres* doctrine, the Court concludes that application of this continuing or separate tort theory to plaintiff's case would be inconsistent both with the instant facts and with the language and rationale of *Feres*. Plaintiff's brain, cardiovascular, hearing, respiratory, and eyesight difficulties for which he seeks compensation were not shown to be caused in any way by the government's failure to treat plaintiff after discharge or to warn him of the true nature of the gas to which he had been exposed. There was no testimony that his injuries were in any way aggravated or multiplied by this alleged negligence on the part of the government, nor was it shown that follow-up treatment could have avoided any long-term effects of the exposure, as was the case in *United States v. Brown, supra.* Indeed, simply stated, there was no evidence to support a conclusion that there was any causal connection between the plaintiff's present condition and the government's alleged failure in regard to the issue now addressed. The *Feres* doctrine, in the Court's view, is one of broad application. Disallowing recovery for an in-service tort under *Feres,* but allowing recovery for a failure to monitor and treat injuries resulting from that same tort would leave very little of *Feres* immunity, especially in cases where injuries do not manifest themselves until after a serviceman's discharge. *See Broudy v. United States,* Civ.No. 79–02626LEW(GX) (C.D.Cal., Jan. 2, 1980).

Plaintiff argues, as Judge Richey suggests in *Thornwell, supra,* that *Feres* may be avoided in cases where the military commits an intentional or unconstitutional act and then negligently fails to protect the serviceman from the consequences that will flow from that original wrongful act. *See Thornwell, supra* at 352. Initially, the Court finds that the exposure of plaintiff to a harmful concentration of mustard gas was, at best, a negligent act or omission rather than an intentional one. The corpsmen conducting the 1944 experiment appear to have taken more than adequate precautions to prevent any such contact with the toxic gas. In light of this finding, plaintiff's case is analagous to *Henning v. United States,* 446 F.2d 774 (3d Cir. 1971), *cert. denied,* 404 U.S. 1016, 92 S.Ct. 676, 30 L.Ed.2d 664 (1972), and *Wisniewski v. United States,* 416 F.Supp. 599 (E.D.Wis.1976), in which acts of government negligence occurred while the servicemen were on active duty and which remained uncorrected after discharge. In both cases, *Feres* was held to bar recovery. But more importantly, the Court questions how the *Feres* doctrine of intra-military immunity and its underlying rationale may be limited in relation to the seriousness of the tort involved. Characterization of the government's conduct as intentional or unconstitutional or shocking to the conscience does not make the statutory substitutes for tort liability any less adequate or the threat to discipline posed by suits against the military any less real.

Several courts have held *Feres* to immunize the government from liability for in-service experimentation with drugs and atomic weapons. *See Jaffee v. United States, supra; Lerner v. United States,* No. 78–6020 (2d Cir. April 24, 1978) (unpublished); *Nagy v. United States,* 471 F.Supp. 383 (D.D.C.1979); *Stanley v. Central Intelligence Agency,* No. 78–8141 (S.D.Fla. May 14, 1979) (unpublished). Indeed, in *Broudy v. United States, supra,* the court specifically rejected a claim, similar to the instant plaintiff's argument, for recovery under a post-discharge continuing tort theory.

The Court neither condemns nor condones the government's conduct with regard to plaintiff. The Department of the Navy could well have been more attentive to plaintiff's immediate reactions to the mustard exposure and perhaps should have ensured that the subjects were fully informed of the true nature of the experiment once the need for secrecy had passed. Further, some notation of the subjects' participation in the experiment ought, in the Court's view, to have been noted in their service

record. Fairness dictates, however, to note that the experiment took place in 1944 and the matter should be viewed in light of the conditions then existing. Additionally, the Department of the Navy was unaware for more than thirty years that plaintiff, justifiably or not, viewed the exposure to the gas as precipitating the ailments from which he suffered. The Court, while sympathetic to the debilitating physical condition from which plaintiff suffers, cannot justify an avoidance of the *Feres* bar where the facts and the doctrine's rationale recommend its application.

The Court, therefore, concludes that recovery against the government for plaintiff's injuries allegedly resulting from the 1944 mustard gas experiment is barred by *Feres* and the government's motion to dismiss on each of the asserted grounds requires dismissal.

An appropriate order shall issue.