**Calvin W. SWEET, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 79–3056.**

United States District Court, D. South Dakota, C. D.

Dec. 28, 1981.

Gregory A. Eiesland, Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, S. D., for plaintiff.

Cynthia J. Larsen, Trial Atty., Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D. C., Major Calvin M. Lederer, JAGC, Litigation Div., Dept. of Army, Washington, D. C., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

### CASE SUMMARY

Calvin Sweet brought suit against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, to recover for injuries sustained allegedly as a result of the Army's post-dis-

charge negligence in failing to advise him that he was given lysergic acid diethylamide (LSD) as part of a chemical warfare experiment at Edgewood Arsenal, Maryland, in 1957, and in failing to provide him with the necessary follow-up treatment and care. The United States contends that the suit is barred by the two-year statute of limitations provision of the Federal Tort Claims Act, 28 U.S.C. § 2401(b), and claims "intra-military immunity" under the rule of *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). The United States further contends that Sweet failed to prove any breach of the standard of care or that such a breach was the proximate cause of his injuries. For the reasons which follow, the Court finds that recovery against the United States is barred under both the statute of limitations provision of the Federal Tort Claims Act, and under the *Feres* doctrine of intra-military immunity. In addition, the Court finds that Sweet failed to prove by a preponderance of the evidence that the failure of the United States to provide follow-up care caused his present mental condition or aggravated an earlier mental condition.

## FACTUAL BACKGROUND

In 1957, Calvin Sweet was a nineteen-year old private in the United States Army, stationed at Fort Stewart, Georgia. Responding to a posted notice, Sweet volunteered to participate in a series of chemical warfare experiments to be conducted at the United States Army Chemical Center at Edgewood Arsenal, Maryland. The experiments were designed to test and develop methods for the Army's utilization of, and defense against, chemical warfare agents, including lysergic acid diethylamide (LSD).

On or about September 1, 1957, Sweet was assigned to temporary duty at Edgewood Arsenal for approximately one month. As part of the experiments, Sweet was asked on three occasions to drink a clear, odorless substance. Sweet was told that the substance would cause him no harm. Upon drinking the substance, Sweet was supposed to describe to an Army doctor the sensations he was experiencing. The records relating to Sweet's participation in the experiments, however, do not indicate precisely what chemical substance, if any, was administered to him.

Sweet left the Army in March, 1959, but reenlisted in January, 1961. Upon re-enlistment, Sweet was assigned to a tour of duty in Germany. Sweet, however, was discharged in January of 1962, following an incident for which he was admitted to an Army hospital in Germany because of what an Army doctor described as an "acute episode of violent, uncontrollable behavior while in an intoxicated state." Thereafter, Sweet's commanding officer recommended that Sweet be voluntarily discharged because of recurring nervous spells.

On August 4, 1976, Sweet applied for benefits from the Veterans Administration based on, *inter alia*, the nervous condition which he claimed resulted from his participation in a drug experiment during his first enlistment. The VA determined that Sweet's condition was not compensable. That decision was reversed on appeal and in June, 1977 Sweet was awarded a fifty percent disability retroactive to the date of his claim.[1]

On November 21, 1978, Sweet filed an administrative claim with the Department of the Army, which was denied. Thereafter, Sweet filed this suit in the District Court for the District of South Dakota, Central Division.

I

## STATUTE OF LIMITATIONS

■ Under the Federal Tort Claims Act, a tort claim against the United States is

---

1. The reversal was based upon a diagnosis made pursuant to an LSD follow-up study entitled, Project 50/50, which the Army conducted for persons who participated in its drug experiments. The project doctors diagnosed Sweet as suffering from a hypochondriacal neurosis. Based upon the foregoing diagnosis, the VA awarded Sweet a fifty per cent disability rating for "hypochondriacal neurosis, moderate, chronic superimposed on passive aggressive reaction and anxiety neurosis and marital discord."

barred "unless it is presented in writing to the appropriate federal agency within two years after such claim accrues. . . ." 28 U.S.C. § 2401(b). Sweet filed his administrative claim with the Department of the Army on November 21, 1978. Consequently, for Sweet's claim to be time-barred, it must have accrued prior to November 21, 1976.

Sweet contends that a claim does not "accrue" until the claimant knows of the existence of an injury and its cause. *See United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Sweet argues that he did not know the cause of his injuries until October 16, 1978, when the Army impliedly advised him that he had been given LSD at Edgewood Arsenal in 1957.[2] Although Sweet suspected long before October, 1978, that his injuries were linked to a drug he had received at Edgewood Arsenal, he argues that a mere belief or suspicion as to the cause of his injuries is not sufficient to commence the running of the statute of limitations. *See Tyminski v. United States*, 481 F.2d 257 (3d Cir. 1973). The United States, however, contends that there is ample evidence that Sweet knew of his injuries and their probable cause in September, 1957, or at the very latest, in August, 1976, and therefore Sweet's claim is time-barred.

The Supreme Court recently discussed the limitations under the Federal Tort Claims Act in *United States v. Kubrick, supra.* In *Kubrick*, a veteran had received treatment in a VA hospital in 1968 for a bone infection. Following surgery, a VA doctor irrigated the infected area with neomycin, an antibiotic, until the infection cleared. Shortly after his discharge from the hospital Kubrick noticed a ringing sensation in his ears and some loss of hearing. In 1969, an ear specialist informed Kubrick that it was highly possible that the hearing loss was a result of the neomycin treatment at the VA hospital. Kubrick filed for disability benefits, but the VA denied his claim. In the course of pursuing his administrative appeal in 1971, another ear specialist informed Kubrick that the neomycin treatment had, in fact, caused his hearing loss and the treatment should not have been administered. Kubrick subsequently filed suit under the Federal Tort Claims Act.

The Supreme Court held that Kubrick's claim accrued in 1969 when he was first advised of the probable link between the neomycin treatment and his subsequent loss of hearing. The Court reasoned that the statute of limitations is triggered when a plaintiff possesses "the critical facts that he has been hurt and who inflicted the injury," and not at a later date when he learns that

2. Sweet received a letter dated October 16, 1978 from Major David A. McFarling, Director of Project 50/50, which stated in pertinent part:

Over the past several years, considerable reorganization of the LSD follow-up efforts has taken place and I am now responsible for the overall conduct of the study. In this capacity, records have recently become available to my office which throw your status as a former LSD recipient into question. These records indicate that you either received an "unknown" agent (not specifically noted as LSD) or were a "control" subject. Many individuals who were assigned to sections involved with LSD experimentation did not receive any drugs, and may have been used as untreated "control" subjects (i.e., similar in background to, and used for comparison purposes with, those individuals who actually received LSD). In an attempt to clarify your specific status I have recently contacted the Biomedical Laboratory and determined that

your name appeared on the initial computer voucher of those individuals who received LSD only because you were at Edgewood Arsenal during the time in which LSD testing was being conducted and were assigned to a section which was engaged in LSD testing. For the present time, therefore, the only person who has any additional information on the subject is you. If, during your stay at Edgewood Arsenal (or wherever else you may have participated in chemical warfare experiments), you did not experience any peculiar or unusual mental phenomena—such as visual hallucinations, unusual thoughts, etc.,—it is unlikely that you were exposed to LSD. If you did experience any of these, then you may have received LSD even if available records indicate only "unknown" or "control".

In any case, this letter provides you with the most current information with respect to your possible participation in LSD testing during the period 1956 through 1967.

his injury was negligently inflicted. 444 U.S. at 122–23, 100 S.Ct. at 359–360.

In the instant case, Sweet knew the nature of his injuries as early as September, 1957. Sweet testified that while at Edgewood Arsenal, he suffered a "terrifying experience" after drinking the unknown substance a third time. He also testified that he experienced a "flash-back" during the first month or two following his participation in the experiments. During the two-year period between his discharge from the Army and his re-enlistment (1959–1961), Sweet testified that he was plagued by a nervous condition that made it difficult to concentrate on his work. Sweet further testified that following his re-enlistment, he experienced a flash-back at a restaurant in Germany in 1961.

Sweet's testimony indicates that he believed in his own mind long before October, 1978 that the cause of his nervous condition was linked to a drug he received at Edgewood Arsenal. He stated this belief to various doctors on at least four occasions between 1961 and 1976.[3] More importantly, in his application to the Veterans Administration dated August 4, 1976, Sweet described the nature of the injuries for which he was seeking compensation as:

> Nervous condition, stomach condition, dental conditions, and residuals of hernia operation. The nerves, stomach and teeth are the result of a drug experiment I participated in at George G. Meade, Maryland, during my first enlistment with the Army Chemical Warfare Department.

At that time, Sweet certainly possessed the *critical* facts concerning his injury and its alleged cause "which would prompt a reasonable man to seek legal advice." *Schnurman v. United States*, 490 F.Supp. 429, 435 (E.D.Va.1980).

Sweet's contention that his cause of action did not accrue until he was informed that he had ingested LSD is unfounded. No such requirement can be gleaned from the holding in *Kubrick*, nor does the expert testimony heard in the instant case support such a proposition. Sweet's own expert testified on cross-examination that for purposes of diagnosing and treating a patient's reaction to a drug, it is not medically important to know the specific drug involved. On August 4, 1976, at the very latest, Sweet was in possession of the critical facts "that he [had] been hurt and who [had] inflicted the injury," and accrual of his cause of action did not await identification by the Army of the drug he received at Edgewood Arsenal.[4] Sweet's failure to seek relief under the Federal Tort Claims Act until nearly two years and four months later is fatal to his instant claim.

Sweet's attempt to date the running of the statute of limitations from October 16, 1978 is also unconvincing. An examination of Dr. McFarling's letter reveals that Sweet was informed only that he "may have received LSD."[5] This information added nothing to the critical facts already in Sweet's possession concerning his injury and its alleged cause. Sweet himself testified that he had not acquired any new information between the date he filed his VA claim and the date he commenced this lawsuit.

---

3. A clinical record dated October 24, 1961 from an Army hospital in Germany refers to Sweet's participation in a chemical warfare experiment, and contains the following statement, "[Sweet] believes he may have had a reaction to some of the drugs because of the episodes he has had since." In a medical history dated October 29, 1974, at Rapid City Medical Center, Sweet also linked his nervous condition to his experience at Edgewood Arsenal. On September 13, 1976, and October 5, 1976, respectively, Sweet again stated the same belief to a VA doctor at Ft. Meade, South Dakota, and in a VA hospital admission form at Sioux Falls, South Dakota.

4. Sweet's attempt to avoid the statute of limitations by alleging that the United States concealed information from him is also unfounded. There is nothing in the record to support Sweet's allegation that the Army denied he had received LSD or covertly concealed information concerning Sweet's participation in the Edgewood Arsenal's experiments. More importantly, Sweet's allegations of concealment are directed at events which occurred after Sweet filed his VA claim and therefore do not affect the court's finding that Sweet's claim accrued, at the very latest, on August 4, 1976.

5. *See* note 2, *supra*.

Despite the Court's finding that recovery in the instant case is barred under 28 U.S.C. § 2401(b), the Government's claim of sovereign immunity will also be addressed.

## II

## SOVEREIGN IMMUNITY UNDER FERES

Sweet concedes that his original injury, diagnosed by his experts as a post-traumatic stress disorder, arose out of his military service, and is barred by the doctrine set forth in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In an attempt to avoid the bar of *Feres*, however, Sweet has alleged an independent tort based upon the United States' failure to provide follow-up care after his discharge from the Army.[6] Sweet contends that as a result of the failure to provide follow-up care, he suffered an injury separate and distinct from the injury arising out of his military service.[7] The United States contends that Sweet's injury, if any, arose out of his military service, and therefore recovery is barred under *Feres*.

The Supreme Court, in *Feres v. United States, supra*, held that the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service.[8] In recognizing this exception to the FTCA, the Court relied on several factors. First, the "distinctly federal" relationship between the Federal Government and members of its armed services, requires the application of federal law rather than local law in determining the Government's liability. Second, the Veterans Benefit Act has been established as a comprehensive system of compensation, which provides a statutory no-fault scheme for remuneration. A third factor was explained in *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954). Interpreting the *Feres* rationale, the *Brown* Court emphasized:

> [t]he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty....

*Id.* at 112, 75 S.Ct. at 145.

The viability of the *Feres* doctrine was recently reaffirmed by the Supreme Court in *Stencel Aero Engineering Corporation v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1976). In addition, the Eighth Circuit has given *Feres* a rather broad construction. *See Miller v. United States*, 643 F.2d 481 (8th Cir. 1980), *rev'd on rehearing en banc*, 643 F.2d 490 (8th Cir. 1981); *Alexander v. United States*, 500 F.2d 1 (8th Cir. 1974); and *Chambers v. United States*, 357 F.2d 224 (8th Cir. 1966).

Sweet relies on *Brown v. United States, supra*, and *Thornwell v. United States*, 471 F.Supp. 344 (D.D.C.1979) to support his contention that *Feres* does not bar recovery under the FTCA for post-discharge negligence.[9] In *Brown*, a soldier suffered a knee

---

**6.** Sweet contends that the United States assumed a duty to provide him with follow-up care and information once it became aware that he had been injured by the ingestion of LSD. He argues that the United States knew or should have known in October, 1961, following the incident in Germany, that he would need follow-up care as a civilian. *See* note 15 *infra*.

**7.** That injury is alleged to be the aggravation of his original injury (post-traumatic stress disorder) and the creation of a permanent and irreversible mental illness. *See* note 16 *infra* and accompanying text.

**8.** *Feres* was a consolidation of three claims, *Feres v. United States, Jefferson v. United States*, and *Griggs v. United States. Feres* involved a serviceman who was killed in a barracks fire. *Jefferson* and *Griggs* involved servicemen who received negligent treatment from Army doctors. The Supreme Court denied recovery in all three instances.

**9.** Sweet also relies on *Broudy v. United States*, 661 F.2d 125 (9th Cir. 1981). *Broudy* involved a claim by the widow and children of a deceased serviceman who died of cancer in 1977, as a result of his exposure to radiation when he was a participant in atmospheric nuclear tests conducted in Nevada in 1957. The decedent's

injury while he was on active duty in the armed forces, which eventually led to his honorable discharge in 1944. Six years later, the Veterans Administration performed an operation on the knee. In 1951 a second operation was required, during which VA personnel applied a defective tourniquet, resulting in permanent nerve damage in the former serviceman's leg. Relying on *Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949),[10] the *Brown* Court held that the negligent act giving rise to the injury was not incident to the military service, and therefore, not barred by *Feres.*

In *Thornwell,* the district court considered a serviceman's claim that he had been surreptitiously drugged with LSD and then subjected to intense interrogation while he was imprisoned as part of an Army investigation into a theft of classified documents. The court applied *Feres,* and dismissed all of *Thornwell's* claims for injuries sustained while in the service; the court, however, concluded that *Feres* did not bar Thornwell's post-discharge claims because Thornwell had been injured by two entirely separate torts—an intentional act while he was on active duty, and a subsequent negligent act which "occurred, *in its entirety* after he had attained civilian status." *Thornwell v. United States,* 471 F.Supp. at 351 (emphasis in original).[11]

At the outset, the Court finds that the holding in *United States v. Brown, supra,* is inapplicable to the factual record presented by Sweet and does not necessitate removal of the *Feres* bar. In *Brown,* the actionable injury occurred after the serviceman had been discharged and had assumed civilian status. Recovery was allowed under the FTCA for the government's post-discharge negligent medical treatment, and not for the original service-connected injury. In the instant case, however, the evidence does not support a finding that any alleged injury resulting from the Government's failure to provide follow-up medical care was sufficiently separate and distinct from Sweet's underlying "incident to service" injury. At best, the evidence shows only that Sweet incurred an injury while in the service, the effects of which remained uncorrected following his discharge.[12] In such instances, recovery under the FTCA is barred by *Feres. See Stanley v. Central Intelligence Agency,* 639 F.2d 1146, 1154 (5th Cir. 1981); *In re "Agent Orange" Product Liability Litigation,* 506 F.Supp. 762, 779 (E.D.N.Y. 1980); *Schnurman v. United States,* 490 F.Supp. at 437; and *Thornwell v. United States,* 471 F.Supp. at 351.

The *Thornwell* court held that *Feres* did not preclude a serviceman's claim for post-discharge negligence where the tort is separate and distinct from an intentional tort committed by the Government

by *United States v. Brown.* In addition, the Court found that Thornwell's claim was analogous to that of the plaintiff in *Schwartz v. United States,* 230 F.Supp. 536 (E.D.Pa.1964). *Schwartz* involved a veteran who developed cancer from a radioactive dye, umbrathor, that had been injected into his sinuses while he was an enlisted man in the Navy. The Court found negligence under the FTCA in the Government's failure to inform Schwartz following his discharge of the newly-discovered risks associated with the drug.

widow alleged that the Government had a duty to warn the decedent about radiation's potential effects both before and after exposing him to it and to monitor and treat him for the resulting effects. The court held that if the widow could "allege and prove an independent, post-service negligent act on the part of the Government her claim would be cognizable under the FTCA." 661 F.2d at 128.

10. In *Brooks,* servicemen on leave were negligently injured on a public highway by a Government employee driving a truck belonging to the United States. The *Brooks* Court held that the servicemen were not barred from recovery under the FTCA where the injury was not incident to or caused by their military service.

11. The *Thornwell* court reasoned that allowing recovery for post-discharge negligence was not only consistent with *Feres,* but also compelled

12. As will be discussed in the section on CAUSATION, *infra,* the Court is unpersuaded by the diagnoses of Sweet's experts as to his alleged in-service injury. For purposes of discussing the *Feres* doctrine, however, the Court will assume that Sweet was in fact injured while in the military service.

while the serviceman was on active duty. Initially, the Court finds no evidence that an intentional tort was committed upon Sweet while he was in the service.[13] In addition, the Court is not persuaded by *dicta* in *Thornwell* which would indicate that a negligent act will in some circumstances suffice as the original tort. Recovery for post-discharge negligence under *Thornwell* is limited to instances where a serviceman has been the victim of a willfully inflicted harm while on active duty. *See Stanley v. Central Intelligence Agency*, 639 F.2d at 1154; *Schnurman v. United States*, 490 F.Supp. at 437; and *Everett v. United States*, 492 F.Supp. 318, 322 n.6 (E.D.Ohio 1980).

■ Notwithstanding the Court's view that an intentional in-service tort is a prerequisite to recovery under the *Thornwell* rationale, Sweet also failed to prove he was injured by a separate negligent act occurring "entirely after discharge." Sweet's alleged injury here is inseparably entwined and directly related to the injury he allegedly sustained while in the service. As

will be discussed *infra*, the evidence does not support a finding that the Government's failure to provide follow-up care was a separate act of negligence occurring entirely after Sweet's discharge. The Court, therefore, concludes that recovery against the Government for Sweet's injuries allegedly resulting from the failure to provide follow-up medical care is barred by *Feres*.

### III

### CAUSATION

■ Even assuming the statute of limitations or *Feres* did not bar plaintiff's claim, Sweet failed to prove by a preponderance of the evidence that the failure of the United States to provide follow-up care caused his present mental condition or aggravated an earlier mental condition. Sweet contends that he sustained a post-traumatic stress disorder[14] after being given LSD at Edgewood Arsenal in 1957, and being beaten and abused by military police in Germany in 1961.[15] Sweet contends that the United

---

**13.** Sweet contends that the Government committed a battery upon him by acquiring his consent to the LSD experiment without adequately informing him of the risks involved. The record, however, supports a finding that the Government made reasonable attempts to obtain the informed consent of participants in the Edgewood Arsenal experiments. Testimony of the Government's expert, Dr. Sidney Cohen, indicated that long-term side effects from LSD, as understood in 1957, were very rare and therefore it was appropriate to assure LSD recipients that no long-term effects would occur. In addition, Sweet did sign a consent form and was free to withdraw his consent at any time during the course of the experiments. In short, the evidence regarding Sweet's consent to receiving a drug at Edgewood Arsenal does not support a cause of action for battery.

**14.** According to a diagnostic statistical manual used by psychiatrists in making diagnoses, the essential features of a post-traumatic stress disorder are development of characteristic symptoms following a psychologically traumatic event that is generally outside the range of usual human experiences. The characteristic symptoms involve experiencing the traumatic event, numbing of responses, or reduced involvement with the external world and a variety of unpleasant or cognitive symptoms. The stressor producing this syndrome would evoke

significant symptoms of distress in most people, and is generally outside the range of such common experiences as simple bereavement, chronic illness, business losses, and marital conflict. Stressors producing this disorder include natural disasters, accidental, man-made disasters, and deliberate man-made disasters, such as bombings, torture, and death camps.

**15.** Sweet testified that one evening, while stationed in Germany, he and a friend were sitting in a restaurant drinking beer before dinner, and he felt a flash-back coming on. Sweet ran out of the restaurant, upsetting the table and overturning some chairs. Once outside, Sweet testified he was restrained by a military policeman who beat him about the head and arms with a nightstick. Sweet was then taken to a military police station, where, he testified, he was put in a straight jacket and a gun was pointed to his head. Thereafter Sweet was hospitalized for a short period of time in a United States Army hospital in Frankfurt. The alleged beating, however, is uncorroborated and the Army medical records indicate that Sweet was physically normal when he was admitted to the hospital in Frankfurt. Army doctors diagnosed Sweet's condition as a passive-aggressive personality disorder and an anxiety neurosis. A passive-aggressive personality is an individual who has strong dependency needs which he

States should have properly diagnosed his injury prior to discharge, and thus had a duty to provide him with proper follow-up psychiatric and psychological treatment and care, which duty arose entirely after his discharge. As a result of the United States' failure to provide follow-up care, Sweet claims that he sustained a separate and distinct injury, i.e., the aggravation of his original injury [post-traumatic stress disorder] and the creation of a permanent and irreversible mental illness.[16]

Sweet relies on the diagnoses of his own experts to support the contention that he suffered a post-traumatic stress disorder. Dr. Ralph Fisch, a clinical psychologist, testified that the trauma experienced by Sweet following his exposure to LSD in 1957 caused the post-traumatic stress disorder. Dr. Lawrence Stross, a psychiatrist, testified that the LSD exposure only sensitized or predisposed Sweet to a traumatic experience in the future. The beating and abusive treatment which Sweet received in Germany in 1961, according to Dr. Stross, was the precipitating cause of Sweet's post-traumatic stress disorder. Both Dr. Fisch and Dr. Stross testified that the post-traumatic stress disorder should have been diagnosed following the episode in Germany. The failure of the United States to provide Sweet with follow-up care following his discharge, in the opinion of Dr. Stross and Dr. Fisch, caused the aggravation of Sweet's condition, and created what they termed a "separate and distinct injury." [17] It may be worthy to note that Dr. Stross was the first medical observer ever to diagnose Sweet as suffering from post-traumatic stress and his diagnosis is contradicted by every medical opinion between 1961 and 1981.[18]

The diagnosis of the Government's experts differed sharply from the diagnoses of Sweet's experts. Dr. Sidney Cohen, a UCLA professor of psychiatry and foremost expert in the field of LSD research,[19] testified on behalf of the Government that he knew of no connection in the literature or otherwise ever having been made between the ingestion of LSD and post-traumatic stress disorder, nor had he ever observed any such connection in his work with LSD. In the opinion of Dr. Cohen, LSD does not sensitize or predispose an individual to a post-traumatic stress disorder. Dr. Cohen also testified that no reason existed in 1961 for doctors in Germany to have linked Sweet's experience at Edgewood Arsenal with a post-traumatic stress disorder. Even assuming Sweet received LSD at Edgewood Arsenal, Dr. Cohen testified that LSD could not have been a factor causing Sweet's

feels are not being fulfilled. He will habitually act either passively or aggressively to fulfill the dependency needs he feels he is being denied.

**16.** Some of the emotional, psychological, psychiatric, and mental maladies allegedly suffered by Sweet include: substantial and permanent impairment of his memory, attention, concentration, and social functions; permanent damage to his mental thought processes; frequent fits of depression, helplessness and violent behavior; marital difficulties; alcoholism; and severe mental anguish.

**17.** Both Dr. Stross and Dr. Fisch expressed the opinion that following Sweet's discharge in 1962, his condition was reversible and could have been treated with proper follow-up care. The follow-up treatment would have included hospitalization, psychotrophic medication, and individualized psychotherapy.

**18.** Sweet's medical records accumulated over the last twenty years contain several diagnoses of anxiety neurosis and passive-aggressive personality. For example, in September, 1976, a

VA doctor at Fort Meade, S.D., diagnosed Sweet's problem as anxiety neurosis and marital discord. A VA doctor at Sioux Falls, S.D. examined Sweet in November, 1976 and diagnosed Sweet's condition as "passive-aggressive personality; anxiety neurosis with marital discord." See also note 1 supra.

**19.** Dr. Cohen described himself as a clinical psycho-pharmacologist because of his expertise in the area of the impact of drugs upon mental activity. Dr. Cohen has done extensive research on a number of mind-altering drugs, including fifteen years of research with LSD during the 1950s and 1960s. Approximately 500 individuals with over 100,000 exposures to LSD were involved in Cohen's research. Cohen has published slightly less than 250 medical articles including 40 dealing with hallucinogenic drugs and 25 to 30 dealing with LSD. In addition, Cohen has written four books on the topic of hallucinogenic drugs, two specifically dealing with LSD.

problems.[20] Furthermore, Dr. Cohen testified that he knew of no chronic effects from LSD that would appear four years after its ingestion.[21]

Dr. Cohen's testimony is reinforced by the testimony of the Government's expert, Dr. David Bean.[22] Dr. Bean testified that, in his opinion, Sweet's alleged drug experience at Edgewood Arsenal would not have been a sufficient stressor to cause a post-traumatic stress disorder.[23] Further, Dr. Bean testified that the entire chain of events leading to the restaurant incident in Germany in 1961 and the alleged beating and abusive treatment by the military police was not sufficient to trigger a post-traumatic stress disorder.

The Court finds that the testimony of the Government's experts, especially that of Dr. Sidney Cohen, is much more credible and persuasive than the testimony presented by Sweet's experts as to the cause of Sweet's mental condition. Dr. Cohen is a preeminent expert on the subject of LSD, and his testimony, in this Court's view, must be accorded great weight.[24] The testimony of Dr. Cohen, and that of Dr. Bean refuted the diagnoses of Sweet's experts that Sweet sustained an in-service post-traumatic stress disorder. Sweet's failure to prove an in-service injury is also fatal to his claim for a separate and distinct, post-discharge injury.

Although it is not necessary for this Court to ascertain the cause of Mr. Sweet's mental condition, it appears that one of the other causes testified to by the Government's experts was more probably the cause of Mr. Sweet's condition than any act or omission on the part of the United States.[25] The more credible evidence shows that something other than the 1957 LSD experiment, or the 1961 incident in Germany, or the Government's failure after 1962 to provide follow-up care was the cause of Mr. Sweet's mental condition.

For all of the foregoing reasons, judgment will be entered in favor of the United States and against the plaintiff.

This memorandum constitutes the findings of fact and conclusions of law of the Court.

---

20. Dr. Cohen based his opinion in part upon an evaluation of statements made by Sweet describing the so-called flashbacks he experienced. Sweet spoke in terms of "visual hallucinations" meaning he was seeing things that weren't there, yet he also said he blacked out, meaning he was unconscious. These symptoms described by Sweet appeared to be inconsistent with Cohen's LSD research, and Cohen could not understand how a person could remember having a visual hallucination while in a state of unconsciousness.

21. Dr. Cohen testified that if a flashback occurs, it usually occurs within months, even weeks, after an ingestion of LSD. Furthermore, according to Cohen's testimony, flashbacks do not last more than a few minutes, and they tend to fade out after a person has experienced them. In the instant case, however, Sweet described having a flashback in Germany in 1961, some four years after his alleged exposure to LSD at Edgewood Arsenal. The flashbacks described by Sweet lasted for half an hour to two hours. Moreover, Sweet told doctors conducting the Project 50/50 follow-up study that he had been experiencing one to three flashbacks weekly since he had received LSD in 1957, but in his deposition, Sweet testified that the flashbacks occurred two to four or five times a year for the last twenty years. The frequencies of these so-called flashbacks and their prolonged, variable occurrence some twenty years after the alleged exposure to LSD, led Cohen to the conclusion that Sweet's present mental condition was unrelated to his experience at Edgewood Arsenal in 1957.

22. Dr. Bean, M.D., is Chairman of the University of South Dakota School of Medicine, Department of Psychiatry, and Administrator at the South Dakota Human Services Center, which is the state psychiatric hospital.

23. According to Dr. Bean, the symptoms described by Sweet indicate that he may have experienced a bad trip. In the opinion of Dr. Bean, however, a bad experience from drugs would not be a major stressor which could cause post-traumatic stress disorder.

24. Sweet's own experts, Dr. Fisch and Dr. Stross, accepted Dr. Cohen as a preeminent expert in the field. In addition, neither of Sweet's experts had done any LSD research of their own.

25. Both Dr. Cohen and Dr. Bean testified that in their opinions, Sweet was suffering from hypochondriasis, hyperventilation syndrome or lesser degrees of anxiety.