**Don Roderick SCOTT, et al.**

v.

**William CASEY, et al.**

**Civ. A. No. C81–291A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

April 29, 1983.

Thomas E. Maddox, Jr. of Mull & Maddox, Atlanta, Ga., Allen F. Townsend, Decatur, Ga., for plaintiffs.

Kathy McClure, Asst. U.S. Atty., Atlanta, Ga., Paul F. Figley, Trial Atty., Torts Branch, U.S. Dept. of Justice, Lee S. Strickland, Sp. Asst. U.S. Atty., Washington, D.C., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

Plaintiffs filed this action against the defendants, seeking monetary relief for injuries sustained as a result of their participation in a medical experiment conducted during the late 1950's at the United States Penitentiary in Atlanta, Georgia.[1] On February 14, 1983, a trial was held on the limited question whether the plaintiffs' claims are barred under the two-year or six-month statute of limitations of the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. § 2401(b). Upon careful consideration of the evidence, the oral arguments presented by counsel at the trial, and the parties' proposed findings of fact and conclusions of law, the court makes the following findings of fact and conclusions of law. *See* Rule 52, Fed.R.Civ.P.

1. The original complaint asserted claims against the United States of America, William Casey, in his capacity as Director of the Central Intelligence Agency, Norman Carlson, in his capacity as Director of the Bureau of Prisons, and William French Smith, in his capacity as Attorney General of the United States, under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. § 1346(b); 10 U.S.C. § 1089; the United States Constitution; and the Nuremburg Code. By order dated September 15, 1981, the court dismissed plaintiffs' claim based on the Nuremburg Code and dismissed plaintiff Donn's claim on the ground that he had failed to exhaust his administrative remedies. By order dated April 13, 1982, the court dismissed defendants Casey, Carlson, and Smith in their individual capacities because the defendants had not been properly served. By order dated August 23, 1982, the court dismissed plaintiff Malone's claim due to his failure to respond to the defendants' discovery requests and his status as a fugitive from federal authority. By order dated January 6, 1983,

## I. FINDINGS OF FACT

Between 1955 and 1961, the Central Intelligence Agency (hereinafter "CIA") of the United States Government conducted an "umbrella project" known as Project MKULTRA, under which various subprojects were funded. MKULTRA was "concerned with the research and development of chemical, biological, and radiological materials capable of employment in clandestine operations to control human behavior."[2] While MKULTRA was underway, the CIA contacted Dr. Carl C. Pfeiffer, who was then Chairman of the Department of Pharmacology at Emory University School of Medicine in Atlanta, Georgia, concerning a proposed study of lysergic acid diethylamide (hereinafter "LSD") and its antidotes. Subsequently, Dr. Pfeiffer contacted the United States Bureau of Prisons to request permission to conduct the study under the auspices of the United States Public Health Service (hereinafter "PHS") and Emory University at the United States Penitentiary in Atlanta, Georgia.[3] Permission was granted and, in 1956, the study commenced.[4]

Prior to acceptance into the study, prison applicants were interviewed by the prison psychologist, Dr. L. Bryan. A consent agreement was read to each participant by a medical staff person[5] which stated:

the court dismissed the plaintiffs' constitutional cause of action on the ground that it was barred by the doctrine of sovereign immunity.

2. Defendants' Answers to Plaintiffs' Request for Admissions at ¶ 20.

3. Dr. Pfeiffer was the principal medical researcher in charge of the study. He was assisted by Dr. Harry L. Williams.

4. At the time the study was conducted, a series of articles was published in the prison magazine, "The Atlantian," describing the study. Defendants' Exhs. 10A, 10B, 10C. There is no evidence in the record that the plaintiffs read any of these articles. Plaintiffs deny having done so.

5. Dr. Pfeiffer testified that all participants signed a consent agreement, of which there was only one version. That version was identified by Dr. Pfeiffer and Dr. Henry Murphree,

CONTRACT BETWEEN DEPARTMENT OF PHARMACOLOGY, EMORY UNIVERSITY SCHOOL OF MEDICINE

and

HUMAN VOLUNTEERS AT U.S. PENITENTIARY, ATLANTA, GEORGIA

Date _____

I, _____, the undersigned applicant, hereby apply for permission to participate in an investigation designed to study the hallucinatory effect of lysergic acid diethylamide, LSD–25, and similar compounds which is being conducted by Emory University School of Medicine in cooperation with the Bureau of Prisons of the Department of Justice. I understand that I will be required to undergo a physical examination, including laboratory tests, in order to ascertain if I am a suitable candidate. I further agree to take the drugs offered me on the day of the experiment. The procedure, the potential benefits to humanity, and the risk to my health of participation in this study have been explained to me by Dr. _____, and I understand that there can be no guarantee that I will not become ill as a result of this experiment. I hereby freely assume all such risks of participation in the investigation.

I further agree to cooperate to the fullest extent with the personnel conducting the investigation during the experimental period. I understand that upon completion of my participation in this experiment, the fact that I have thus voluntarily rendered outstanding service to humanity will be placed in my official record. In addition, I understand that each time I am used as a subject, a sum of $3.00 will be deposited in my trust fund account. No such deposit will be made until the Medical Officer has certified that my participation has been satisfactory.

In consideration of the money referred to above, the other considerations referred to above, and for other good and valuable consideration, receipt of which in full is hereby acknowledged by me, I, acting for myself, my heirs, personal representatives, my estate and my assigns, do hereby release Emory University, the doctors, physicians, their assistants and all others participating in this experimental program from all liability of any kind or character, including claims and suits in law or in equity for damages, injury or death which may result to me or to my property from my participation in this experimental investigation.

In witness whereof I hereunto set my hand and affix my seal this the ____ day of _____, 19____.

---

SIGNATURE OF INMATE APPLICANT

Defendants' Exh. 9. The agreement was signed by each participant.[6] Upon acceptance into the study, each participant was initially given varying oral dosages of LSD and other drugs. Each participant was informed of the dosage level in order to acquaint the participant with the effects of the drugs. If the participant chose to proceed, he reported on a weekly basis for an experimental session which lasted approximately twenty-four hours. Each participant was given varying oral dosages of

---

who served as a Public Health Fellow in the study, as Defendants' Exhibit 9. Plaintiffs testified that, while they recall signing a consent agreement, they did not sign the agreement identified as Defendants' Exhibit 9. The court finds the testimony of Drs. Pfeiffer and Murphree on this issue to be credible and the plaintiffs' testimony on this issue to be lacking in credibility. Dr. Pfeiffer is a former department chairman at Emory University and the University of Illinois Medical School. Having observed his demeanor and listened closely to his testimony, the court believes that he testified truthfully. Dr. Murphree is the Chairman of the Department of Psychiatry at Rutgers University Medical School. He served as a fellow in the study and has little professional stake in the outcome of this litigation. Whereas, as discussed *infra* at 478–479, the plaintiffs' credibility was undermined by various inconsistencies and admissions.

6. Defendants were unable to produce the consent agreements signed by the plaintiffs. Dr. Pfeiffer testified that, when he moved his office to smaller quarters in 1972, copies of these agreements were destroyed.

LSD or other drugs and then observed and tested by medical researchers. The objective signs of drug effect were measured and recorded by one of the physicians participating in the study, who, among other things, took hourly measurements of blood pressure, pulse rate, pupil diameter, oral temperature, and hand steadiness. The subjective mental effects were assayed on the basis of an interview with each participant. At the conclusion of a session, the participant was offered a stipend of $3.00 per session, good-time credit, and a promise of a favorable recommendation to the United States Parole Commission.

Plaintiff Scott became a participant in late 1957. At that time, he knew the study involved the ingestion of LSD and other drugs. Scott testified that he signed a consent form prior to his participation in the study. He stated, however, that he did not sign the form that was identified by the government's witnesses, Drs. Pfeiffer and Murphree, as the form used in the study. Scott remained in the study until late 1958, at which time he voluntarily left because he was told by a prison staff person that "there was more to it [LSD] than meets the eye." During and after the study, Scott experienced hallucinations and flashbacks.

Scott testified that he did not learn of the government's involvement in the study until 1977 when he was shown the book *In Search of the Manchurian Candidate* by jailhouse lawyer James Miller. Upon cross-examination, Scott was confronted with a copy of *In Search of the Manchurian Candidate* and admitted that the book was not published until 1979. This inconsistency serves to discredit generally Scott's testimony.

Plaintiff Knight became a participant in September 1958. At that time, he was informed that he would be ingesting LSD and other drugs. He testified that he underwent an initial trial period in the study. He recalled that he signed a consent form prior to his participation in the study but was unable to recall whether he signed the version identified by Drs. Pfeiffer and Murphree. Knight testified that he believed the study was being conducted by Emory University and was unaware of the government's involvement in the study until 1977 when he read a newspaper article concerning the study in *The Atlanta Constitution.* Knight stated that he filed his administrative tort claim approximately six months after reading the article. The article, however, was published on August 10, 1975, and not in 1977. This fact discredits Knight's testimony.

Knight also stated that he felt that the Bureau of Prisons "let the study go on," that the study was conducted in the prison hospital, that he applied to the prison psychologist to participate, and that he believed the Bureau of Prisons would be giving him good-time credit for his participation in the study. These admissions discredit Knight's testimony that he was unaware of the government's involvement in the study. During and after the study, Knight experienced flashbacks and a loss of memory, which he attributed to his ingestion of LSD.

Plaintiff Kirk participated in the study from approximately 1957 until 1959. At the time he applied for acceptance into the study, he was told that he would be ingesting LSD. Kirk testified that he did not undergo an initial trial period in the study. This testimony is inconsistent with that of plaintiffs Scott and Knight and Dr. Murphree. Kirk testified that he signed a consent form but claimed that the form referred only to the sponsorship of Emory University and, furthermore, that it was not the form identified by Drs. Pfeiffer and Murphree. Nevertheless, Kirk testified that the study was conducted in the prison hospital and that he applied to the prison psychologist to participate. Despite his awareness of these aspects of the study, Kirk insisted that he did not learn of the government's involvement in the study until 1977.

The court finds Kirk's testimony to be lacking in credibility. It conflicts with an earlier in-court statement and an earlier written statement made by Kirk. During the government's presentation of its case,

Kirk first testified that he knew that the study was being conducted by Emory University and the federal government. Kirk later testified that he believed the study was being conducted only by Emory and that he was unaware of the sponsorship of the PHS. But, upon cross-examination, Kirk admitted that prior to the trial he had attested that at the time he applied to participate in the study, he was told that the study was being conducted by Emory and the PHS. In an attempt to explain this inconsistency, Kirk claimed that although he read and signed this attestation, he did not mean to make this statement. Rather, he claimed the affidavit was incorrectly drafted by his attorney. The court finds Kirk's attempts to recant his testimony that he knew of the involvement of the PHS to be unavailing.

Kirk also testified that during and after the study he experienced flashbacks. And, while participating in the study, Kirk suffered an injury to his hand, which he attributed to the ingestion of LSD. He left the study due to this injury and, at that time, believed his mind was not as sharp as it had been prior to participating in the study.

After leaving the study, neither Scott nor Knight sought medical assistance for their alleged injuries. Kirk did not seek medical assistance after 1960, nor did he inform psychiatrists or psychologists whom he subsequently saw that he had been given LSD.

By the late 1960's, the general properties of LSD, including its propensity to cause hallucinations, flashbacks, and personality disorders, had become a matter of public knowledge. Defendants' Exhs. 11A–F. On August 10, 1975, an article describing the study conducted at the Atlanta Penitentiary was published. Defendants' Exh. 26. It detailed the involvement of Dr. Pfeiffer and Dr. Bryan, the prison psychologist, in the study. It specifically stated that the study involved the ingestion of LSD and other mind-altering drugs by prisoner volunteers, that "[t]he National Institute of Mental Health, a government branch, contributed some of the funding for Pfeiffer's work ...," and that "the medical director of the [Bureau of Prisons] knew the experiments were going on in Atlanta, but there are no hints that anyone higher than the local prison warden had to give permission for them." Id. And, Dr. Pfeiffer published an article in 1960 concerning the study, which described the methodology of the study and specified the identity, nature, and dosages of the drugs given to the participants. Defendants' Exh. 12B.

On October 21, 1977, plaintiff Scott filed an administrative claim for personal injuries in the amount of $500,000 with the Bureau of Prisons. Defendants' Exh. 6A. Thereafter, on January 10, 1978, the Bureau advised Scott that his claim had been received. Defendants' Exh. 6B. Subsequently, on July 10, 1980, the Bureau sent Scott a letter by certified mail advising him that "the Bureau had completed the review of his Administrative Claim for lost property in the amount of $500,000" and that the claim was barred. At that time, Scott was incarcerated at the United States Penitentiary in Atlanta, Georgia. Although the letter was addressed to Scott, the denial was sent to Warden Hanberry at the penitentiary and received by someone named "Gilbert," who apparently was acting in the warden's behalf. The return receipt was stamped with the date "July 14, 1980." Scott testified that he has not received notice of the Bureau's denial of his claim.

Plaintiff Knight filed an administrative claim with the Bureau on June 6, 1978. Defendants' Exh. 24. Thereafter, on June 28, 1978, the Bureau advised Knight that his claim had been received. Several months later, on October 4, 1978, the Bureau sent Knight a final denial of his claim. At that time, Knight was incarcerated at the Atlanta Penitentiary in Atlanta, Georgia. The denial was sent to Warden Hanberry at the penitentiary and received by someone there whose name is illegibly signed on the return receipt. Defendants' Exh. 25, 25A. Knight testified that he has not received notice of the Bureau's denial.

Plaintiff Kirk filed an administrative claim with the Bureau on October 27, 1977. He testified that he has not yet received a final denial of his claim.

Plaintiffs filed the instant lawsuit on February 17, 1981.

## II. CONCLUSIONS OF LAW

■ Under the FTCA, a tort claim against the United States is barred "unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues...." 28 U.S.C. § 2401(b). The question of when a claim accrues within the meaning of 28 U.S.C. § 2401(b) is determined by federal law. *See Mendiola v. United States,* 401 F.2d 695 (5th Cir. 1968). In the present case, if plaintiff Kirk's claim accrued prior to October 22, 1975, and if plaintiff Scott's and Knight's claims accrued before 1976, their suit is time barred.

■ "The United States as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941) (citations omitted). Congress created a limited waiver of sovereign immunity in the FTCA. *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). That waiver allows suit only on prescribed terms and conditions. *Honda v. Clark,* 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1967). Thus, although the FTCA allows suit against the government for torts committed by its employees while acting within the scope of their employment, the Act specifically requires that a claim be presented to the appropriate federal agency within two years of its accrual. Because the FTCA constitutes a waiver of sovereign immunity, courts should strictly construe the limitation period established by Congress. *See Flickinger v. United States,* 523 F.Supp. 1372, 1375 (W.D.Pa.1981); *United Missouri Bank South v. United States,* 423 F.Supp. 571, 577 (W.D.Mo.1976); *Thompson v. Dugan,* 427 F.Supp. 342, 344 (E.D.Pa. 1977).

In the context of medical malpractice cases,[7] courts have held that the tort action does not accrue for statute of limitations purposes until the plaintiff is put on notice of the wrong. *Waits v. United States,* 611 F.2d 550, 552 (5th Cir.1980) (*citing Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)). "The question of what knowledge should put a claimant on notice of the existence of a viable claim is not soluable by any precise formula." *Id.* Courts considering this question, however, have distinguished between plaintiffs who are ignorant of the underlying facts of the act or omission that allegedly caused the injury and those who are ignorant of the legal or medical significance of a known act and injury.

For example, in *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259, a veteran was treated at a Veterans Administration (hereinafter "VA") hospital in 1968 with neomycin for an infection of the

---

**7.** Both parties have analyzed the plaintiffs' claims as alleging medical malpractice. Although the government has consistently denied that a doctor-patient relationship existed between the doctors conducting the study and the participants, the government concedes that, for purposes of the statute of limitations issues, the plaintiffs' claims allege malpractice.

The court notes that at the close of the trial the plaintiffs' counsel raised the contention that the plaintiffs had also set forth cognizable claims against the government based on the alleged negligent funding of the study, which were not barred by the two-year statute of limitations. The court finds this contention unavailing. Plaintiffs have cited no authority supporting the imposition of liability for a cause of action based on the negligent funding of a research project, which is independent from malpractice liability. Moreover, during the litigation of this case, the plaintiffs have not challenged the defendants' characterization of the plaintiffs' claims as alleging malpractice. Finally, assuming *arguendo* that the plaintiffs have set forth claims based on negligent funding which are legally distinct from their malpractice claims, the plaintiffs have given the court no reason to believe that such claims would not also be barred by the FTCA's two-year statute of limitations. The court has concluded *infra* at 482 that the plaintiffs knew of the government's involvement in the study at the latest in the early 1960's. This conclusion applies with equal force to the plaintiffs' negligent funding claims. At that time, the plaintiffs possessed the critical facts concerning their injury and its alleged cause which would prompt a reasonable man to seek legal advice.

right femur. The irrigation of the infected area with neomycin led to a ringing sensation and some loss of hearing in Kubrick's ears six weeks later. In 1969, Kubrick was advised by an ear specialist, who had secured Kubrick's hospital records, that the loss of hearing might be due to the neomycin treatment administered at the hospital. Kubrick filed for disability benefits, but the VA denied his claim. In the course of pursuing his administrative claim in 1971, another ear specialist informed Kubrick that the neomycin treatment had, in fact, caused his hearing loss and that the treatment should not have been administered. Kubrick subsequently filed suit under the FTCA.

The Supreme Court held that Kubrick's claim accrued in 1969 when he was first advised of the probable link between the neomycin treatment and his subsequent loss of hearing. The court reasoned that the statute of limitations is triggered when a plaintiff possesses "the critical facts that he had been hurt and who inflicted the injury," and not at a later date when he learns that his injury was negligently inflicted. *Id.* at 122–23, 100 S.Ct. at 359.

Subsequent to *Kubrick,* three district courts have applied this test to claims brought by confirmed LSD experiment participants. In *Sweet v. United States,* 528 F.Supp. 1068 (D.S.D.1981), *aff'd on other grounds,* 687 F.2d 246 (8th Cir.1982), the plaintiff argued that his cause of action did not accrue until he was informed that he had ingested LSD. Rejecting this argument, the district court stated:

> Sweet knew the nature of his injuries as early as September, 1957. Sweet testified that while at Edgewood Arsenal, he suffered a "terrifying experience" after drinking the unknown substance a third time. He also testified that he experienced a "flash-back" during the first month or two following his participation in the experiments. During the two-year period between his discharge . . . and re-enlistment (1959–1961), Sweet testified that he was plagued by a nervous condition that made it difficult to concentrate

on his work. Sweet further testified that following his re-enlistment, he experienced a flash-back at a restaurant in Germany in 1961.

> Sweet's testimony indicates that he believed in his own mind long before October, 1978 that the cause of his nervous condition was linked to a drug he received at Edgewood Arsenal. He stated this belief to various doctors on at least four occasions between 1961 and 1976. More importantly, in his application to the Veterans Administration dated August 4, 1976, Sweet described the nature of the injuries for which he was seeking compensation as:

>> Nervous condition, stomach condition, dental conditions, and residuals of hernia operation. The nerves, stomach and teeth are the result of a drug experiment I participated in at George G. Meade, Maryland, during my first enlistment with the Army Chemical Warfare Department.

> At that time, Sweet certainly possessed the *critical* facts concerning his injury and its alleged cause "which would prompt a reasonable man to seek legal advice."

528 F.Supp. at 1072 (citations omitted).

Similarly in *Loeh v. United States,* No. 77–2065–B, slip op. (S.D.Ill. January 21, 1982), the plaintiff maintained that his cause of action did not accrue until he was informed that he had received LSD. Nevertheless, the court found

> Loeh knew the nature of his purported injury as early as December of 1957. He testified that he suffered an extremely frightening experience while he was at Edgewood Arsenal and that he was plagued by feelings of numbness, isolation and subsequently anxiety. . . .

> Furthermore, it is beyond question that in June of 1965, when Loeh was informed by the Veterans Administration that his Army records showed participation in a volunteer medical research program and that he had experienced a reaction to a second test for which an antidote was given, Loeh possessed the critical facts

concerning his injury and its alleged cause sufficient to "prompt a reasonable man to seek legal advice."

*Id.* at 22–24. Finally, in *Cox v. United States,* 513 F.Supp. 564 (W.D.Ky.1981), the court ruled that the limitations period under the FTCA began to run when the plaintiff became aware of his medical problems and that he had participated in LSD experiments while in the Army. There, the plaintiff was informed on April 26, 1976, of his participation in the experiment. On May 18, 1977, the plaintiff wrote to the defendant stating that he was experiencing unexplained medical problems. The court found that the plaintiff's claim accrued on May 18, 1977. In reaching this conclusion, the court rejected the plaintiff's argument that the limitations period did not begin to run until the "defendant had fully discharged a duty to advise plaintiff of the dangerous propensities of the drugs and to provide medical assistance to overcome any such effects." *Id.* at 565.

■ In the present case, the plaintiffs' claims accrued for purposes of the FTCA's two-year statute of limitations at the latest in the early 1960's when they possessed the critical facts that they had suffered injuries from their ingestion of LSD and other drugs and who inflicted those injuries. Plaintiffs' testimony indicates that, at the time they participated in the study, they knew the identity of the primary drug administered during the study—LSD—and the nature of its effects—hallucinations and flashbacks. Their testimony also reveals that they experienced hallucinations and flashbacks during and after the study, which they attributed to their ingestion of LSD. Plaintiffs' testimony shows that they knew that the study was being conducted at the prison hospital, that they initially applied for acceptance into the study with the prison psychologist, Dr. Bryan, and that

they knew they were to receive good-time credit and a promise of a favorable recommendation to the United States Parole Commission.

As Judge Cardozo once observed, "[w]e are not to close our eyes as judges to what we must perceive as men." *People ex rel. Alpha Portland Cement Co. v. Knapp,* 230 N.Y. 48, 63, 129 N.E. 202, 208 (1920). The court is hard pressed to believe that, given the foregoing circumstances, the plaintiffs were unaware of the government's involvement in the study. In light of the evidence presented by the parties, the court concludes that at the time of the study or shortly thereafter the plaintiffs possessed the critical facts concerning their injuries, its alleged cause, and the identity of the alleged tortfeasor which would prompt reasonable men to seek legal advice. *See Sweet v. United States,* 528 F.Supp. at 1072; *Loeh v. United States,* slip op. at 23–24; *Cox v. United States,* 513 F.Supp. at 565.

Plaintiffs' contention that their cause of action did not accrue until they were informed of the CIA's involvement in the study is unfounded.[8] No such requirement can be gleaned from the single case, *Liuzzo v. United States,* 485 F.Supp. 1274 (E.D. Mich.1980), cited by the plaintiffs.

Unlike the plaintiffs in *Liuzzo,* the plaintiffs in the present case knew the identity of the alleged tortfeasor—the federal government—at the time they participated in the study. Plaintiffs testified that they applied to participate in the study with the prison psychologist, Dr. Bryan, that the study was being conducted in the prison hospital, and that they were to receive good-time credit and a promise of a favorable parole recommendation. In the court's view, it is not unreasonable to impose upon the plaintiffs, who were in possession of this information, the obligation to investi-

---

8. Plaintiffs also attempt to avoid the statute of limitations by alleging that the United States concealed the identity of the tortfeasor from them and that they were "blamelessly ignorant" of their injury. First, there is nothing in the record to support the plaintiffs' allegation that the Bureau of Prisons denied that the

plaintiffs had been given LSD or that the Bureau had covertly concealed the information concerning the plaintiffs' participation in the Atlanta Penitentiary study. Second, there is nothing in the record to demonstrate the presence of a latent injury or an injury of which the plaintiffs were blamelessly ignorant.

gate the legal identity of the tortfeasor. The court rejects the contention that the plaintiffs' cause of action did not accrue until they knew which agency of the federal government sponsored the study.[9] Plaintiffs' failure to seek relief under the FTCA until nearly seventeen years later is fatal to their claims.[10]

Accordingly, the clerk of the court is DIRECTED to enter judgment in favor of the defendants.

IT IS SO ORDERED.

9. *See Wollman v. Gross,* 637 F.2d 544 (8th Cir.1980); *Steele v. United States,* 599 F.2d 823 (7th Cir.1979); *West v. United States,* 592 F.2d 487 (8th Cir.1979); *Flickinger v. United States,* 523 F.Supp. 1372 (W.D.Pa.1981).

10. Because the court finds that the plaintiffs' claims are barred by the FTCA's two-year statute of limitations, the question whether their claims are also barred by the six month statute of limitations will not be addressed.